IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |
|---|---|
| CORDIAL ENDEAVOR CONCESSIONS OF ATLANTA, LLC, ET AL, | |
| **Plaintiffs,** | CIVIL ACTION FILE NO. 1:18-CV-01973-MHC |
| **vs.** | |
| CITY OF ATLANTA, ET AL, | |
| **Defendants.** | |

## VERIFIED AMENDED COMPLAINT

Plaintiffs Cordial Endeavor Concessions of Atlanta, LLC ("Cordial") and

Shelia Edwards ("Edwards"; Cordial and Edwards are collectively referred to as

the "Plaintiffs") hereby make their verified amended complaint against Defendants

the City of Atlanta ("City"), former Mayor of the City of Atlanta Mohammed K.

Reed ("Reed"), XpresSpa Holdings, LLC ("Holdings"), XpresSpa Atlanta

Terminal A, LLC ("XpresSpa Atlanta"), Azure Services, LLC ("Azure"),

Montclair Douglas, LLC  ("MD-Jones"); MeMe Marketing and Communications,

LLC ("MMC"), Melanie Hutchinson ("Hutchinson"), Kenja Parks ("K. Parks"),

and Bernard Parks, Jr. ("Parks, Jr."). Plaintiffs respectfully show this Honorable Court the following facts.

## I.   PARTIES, JURISDICTION AND VENUE

1.

Cordial is a Georgia limited liability company, whose principal place of doing business is located in Atlanta, Fulton County, Georgia.

2.

Edwards is a resident of the State of Georgia and the majority owner of Cordial.

3.

Defendant City is a municipal corporation chartered under the laws of the State of Georgia. Of particular importance to this case, the City is a recipient of funds from the federal government for Hartsfield-Jackson Atlanta International Airport ("Airport") as a sponsor of the federal Airport Concessions Disadvantaged Business Enterprise ("ACDBE") program with all attendant duties and responsibilities. The City may be served by service upon its Chief Executive Officer, Mayor Keisha Lance Bottoms, 55 Trinity Avenue, 2nd Floor, Atlanta, Georgia 30303.

4.

Defendant Reed, the immediate past Mayor of the City, is a resident of the City, who resides at 105 Olde Overlook Court. S.W., Atlanta, Georgia 30331.

5.

Defendant Holdings is a Delaware limited liability company.  Holdings does business in Georgia and as such, it should be registered as a foreign corporation doing business in the state; however, it is not.  During all or some of the time period covered by the allegations of this Complaint, Holdings (i) transacted substantial business in Georgia; (ii) committed tortious acts or omissions in Georgia against Cordial and Edwards ; (iii) committed tortious acts and omissions outside of Georgia which caused injury to Cordial and Edwards within Georgia; and (iv) participated in a conspiracy with others who reside within Georgia, knowing that its conspiratorial acts and those of its co-conspirators would have a negative effect on Cordial and Edwards inside Georgia.  Accordingly, Holdings is subject to the jurisdiction of this Court pursuant to *O.C.G.A. § 9-10-91* of the Georgia Long Arm Statute and may be served pursuant to the provisions of *O.C.G.A. § 9-10-94*, by serving its registered agent The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801.

3

6.

Defendant XpresSpa Atlanta is a New York limited liability company registered to do business in Georgia.   XpresSpa Atlanta is subject to the jurisdiction of this Court and may be served by serving its registered agent CT Corporation at 289 S. Culver Street, Lawrenceville, Georgia 30046-4805.

7.

Defendant Azure is a Georgia limited liability company, whose principal owner is Adra Wilson ("Wilson").  Azure is subject to the jurisdiction of this Court and may be served by serving its registered agent Wilson at Azure's registered office located at 2340 Glynn Drive, SE, Atlanta, GA 30316.

8.

Defendant MD-Jones is a Georgia limited liability company, whose principal owner is Tia Jones ("Jones"). MD-Jones was administratively dissolved in December 2016, but MD-Jones remains subject to suit and is subject to the jurisdiction of this Court and may be served by serving its registered agent Jones at Montclair Douglass (Jones) registered office located at 4279 Roswell Road, Building 102, Suite 223, Atlanta, Georgia 30342.

9.

On information and belief, Defendant MMC is a Georgia limited liability company, whose principal owner is Hutchinson.   MMC is subject to the jurisdiction of this Court and may be served by serving its registered agent Corporate Service Company located at 40 Technology Parkway South, Suite 300, Norcross, Georgia 30092.

10.

Defendant Hutchinson is a resident of the State of Georgia, who resides at 6603 Sweetwater Point, Flowery Branch, Georgia 30542.  Hutchinson is subject to the jurisdiction of this Court.

11.

Defendant K. Parks is a resident of the State of Georgia, who resides at 510 Semira Street, SW, Atlanta, Georgia 30331.  K. Parks is subject to the jurisdiction of this Court.

12.

Defendant Parks, Jr. is a resident of the State of Georgia, who resides at 510 Semira Street, SW, Atlanta, Georgia 30331.  Parks, Jr. is subject to the jurisdiction of this Court.

13.

Venue is appropriate in this Court pursuant to ***Article 6, Section 2, Paragraphs 4 and 6*** of the Constitution of the State of Georgia and ***O.C.G.A. § 9-10-31***.

## II.   <u>CASE SUMMARY</u>

14.

XpresSpa is the trade name of a business which provides day spa services at airports.  (the trade name of the business, as carried on by various entities over time, including Holdings, is referred to in this complaint as "XpresSpa"). XpresSpa was founded by Moreton and Marisol Binn ("the Binns"), who initially conducted the business through a limited liability company named Binn and Partners, LLC ("B&P").

15.

In 2008, B&P, through affiliated entities XpresSpa Atlanta Terminal A, LLC ("XpresSpa Atlanta") and XpresSpa-JDEE JV, LLC ("XpresSpa-JDEE") entered into two concessions agreement leases with the City for spa stores to be operated on the A concourse at the Airport (the "A Store") and the C concourse at the Airport (the "C Store"). Taking into account contractually provided for extensions,

the A store and C store leases were for ten (10) year terms, respectively.  (The A Store lease is attached hereto as ***Exhibit 1***).

16.

As a recipient of federal funds in support of the Airport, the City is required to adopt, implement, and administer an ACDBE program, which provides for participation by socially and economically disadvantaged individuals in the airport concessions industry.   The City, as a general proposition, requires ACDBE participation in all of its Airport concessions agreements.

17.

ACDBE firms must be at least 51% owned and operated by socially and economically disadvantaged individuals.   Social disadvantage refers to various racial, gender or ethnic characteristics, and economic disadvantage refers to the individual's financial net worth (calculated in accordance with the regulations). The program is governed by the federal regulations set forth at ***49 C.F.R., Parts 23 and 26*** and the FAA Joint Venture Guidance dated July 27, 2008, a document that expounds upon the regulations (***49 C.F.R. Parts 23 and 26 and the FAA Joint Venture Guidance*** are hereinafter referred to as the "ACDBE Regulations").

18.

In January 2011, USDOT adopted regulation *49 C.F.R. § 26.83(h)*, which provided that once an ACDBE firm was certified, it remained certified, unless and until it was decertified by its certifying agency under procedures which afforded the ACDBE firm due process.  (*Exhibit 2*).    Thus, under this rule, there is no automatic decertification of an ACDBE firm following a change in its ownership.

19.

XpresSpa Atlanta and XpresSpa-JDEE were required to have ACDBE participation pursuant to their agreements with the City for the A Store and the C Store beginning in 2008.  When XpresSpa Atlanta and XpresSpa-JDEE entered into these concessions agreements with the City, their primary ACDBE partner was Jakki Colours, Inc. ("JCI").  Due to difficulties, JCI was unable to fulfill its financial commitments under either concessions agreement.  As a result of JCI's financial difficulties, XpresSpa Atlanta and XpresSpa-JDEE were threatened by the City with defaults under the concessions agreements.

20.

In late 2010 to early 2011, JCI's interests in XpresSpa Atlanta and XpresSpa-JDEE were terminated by B&P due to JCI's financial inability to perform.  As a result of these terminations, XpresSpa Atlanta and XpresSpa-JDEE

were in need of a new ACDBE partner(s) to meet their ACDBE participation requirements, as they had none in either the A Store or the C Store for an extended period of time.

21.

In the spring of 2011, the Binns met Edwards and Steven White ("White"), friends and entrepreneurs, who had learned of XpresSpa Atlanta and XpresSpa-JDEE's needs for ACDBE participation and who were interested in pursuing the business opportunity to become XpresSpa Atlanta and XpresSpa J-DEE's ACDBE partner.

22.

Edwards' career included her spending years with what was at the time one of the world's largest international airport concessionaires (a British company). This concessionaire's U. S. headquarters was based in metropolitan Atlanta, and it had substantial concessions agreements at the Airport.  During her tenure with this international concessionaire, Edwards was involved in business development and ACDBE relations.  She was promoted numerous times, ultimately to the position of Vice President where she was a direct report to the Chief Executive Officer of the company.  Throughout her tenure with this international concessionaire, Edwards worked closely with the company's ACDBE partners in Atlanta and

around the country in cities which included Los Angeles, Chicago, Denver and New Orleans.  In so doing, she became intimately knowledgeable about and gained extensive experience with the ACDBE program.

23.

White's career included a long tenure on Wall Street as a Managing Director specializing in public finance with the firms J. P. Morgan and Morgan Stanley. While with J. P. Morgan, White was the lead banker on the $1 billion bond issuance for the financing of the Airport's fifth runway.  As of 2011, White had retired from Wall Street and was pursuing varied investment opportunities.

24.

The Binns were impressed with the experience and credentials of both Edwards and White and expressed interest in pursuing a transaction pursuant to which a company to be formed by Edwards and White, that would meet ACDBE requirements, would become the ACDBE participant in XpresSpa Atlanta and XpresSpa-JDEE.  Beginning in the spring of 2011, Edwards and White were engaged in business negotiations with B&P as to a transaction pursuant to which a company they would organize as an ACDBE firm would acquire an interest in XpresSpa Atlanta and XpresSpa-JDEE.

10

25.

At some point during these discussion, B&P cut off negotiations relating to the sale of an interest in XpresSpa-JDEE to Cordial.  In so doing, B&P falsely represented to Cordial that the City did not require XpresSpa-JDEE to have ACDBE participation as to the C store.  As a result of B&P removing XpresSpa-JDEE from consideration, the parties' discussions and negotiations, which extended until November 2011, centered on the sale of a 36% ACDBE interest in the A store of XpresSpa Atlanta.  Cordial would later find out during its review meeting with the City that the ACDBE participation level goal for the A Store location was 40% when XpresSpa Atlanta's proposal was submitted to win the contract.  The Binns purposefully hid this information from Cordial when it offered the company 36% ACDBE participation in the A store.

26.

As the ongoing discussions between B&P, Edwards, and White progressed into the fall of 2011, Edwards and White were introduced to Parks, Jr., an individual who had expressed an interest in becoming active in Airport concessions.  Based upon frequent statements made by the City administration that it was interested in introducing the "next generation" of entrepreneurs into the Airport concessions industry, Edwards and White engaged in early discussions

11

with Parks regarding the opportunity to become an investor/minority interest holder and the financing that would be required to participate in the venture. Following these discussions, Parks, Jr. was offered the opportunity to participate in the contemplated day spa concessions opportunity.

27.

Edwards took the lead in preparing the documents for submission for ACDBE certification for the new company. It was during one of several follow-up discussions that Parks, Jr. stated that he had a company that (i) was already ACDBE certified; (ii) was dormant; and (iii) could be reorganized to become the entity to acquire the interest in XpresSpa Atlanta. The company to which Parks, Jr. referred was Montclair Douglas, LLC ("Montclair")[1].

28.

Montclair was originally organized on February 20, 2011 as a Georgia limited liability company. Jones was its sole member when it was originally organized.

---

[11] Montclair is not the same company that is defined as MD-Jones and is a defendant in this lawsuit.

29.

In February 2011, Montclair applied to the Georgia Department of Transportation ("GDOT") for certification as an ACDBE.  On April 18, 2011, GDOT approved Montclair's ACDBE application.  As it will be detailed below in this Complaint, Montclair, who subsequently went through both ownership and name changes, has been continuously certified as an ACDBE entity from April 2011 until the present time and has never been decertified, i.e., it has never lost its ACDBE certification since the time it was awarded to the company.

30.

From its organization in February 2011 until November 2011, Montclair was a dormant company, with one owner and no business activity.

31.

Parks, Jr. represented to Edwards and White that he had a prior business relationship with Jones and that he was her business partner in Montclair.  Parks, Jr. said that he, with Jones' consent and their joint participation in the XpresSpa Atlanta acquisition, could offer to Edwards and White the utilization of the dormant Montclair, upon reorganization, as the entity to acquire the ACDBE interest in XpresSpa Atlanta.  Parks, Jr. stated that Montclair would be reorganized from a single-member LLC (Jones) into a multi-member LLC.  Parks, Jr. pledged

that he and Jones would be good partners and would make positive contributions to the partnership if they were allowed to participate.

32.

Edwards and White continued the negotiations with B&P regarding the business terms for the acquisition of the 36% membership interest in XpresSpa Atlanta.  Once it appeared that Edwards and White were close to a final deal with B&P, Edwards and White began negotiating with Parks, Jr., Jones, and their legal counsel, Brandon Williams ("Williams") formerly of the law firm Alston & Bird, regarding the reorganization of Montclair from a single member to a multi-member entity prior to the acquisition.   Parks, Jr. and Jones, with the assistance of Williams, also reviewed, commented upon, and offered recommended changes on the purchase and sale documentation as to the acquisition of the 36% interest in XpresSpa Atlanta.

33.

B&P, Edwards, and White agreed upon a purchase price of $650,000 for the acquisition of the 36% interest in XpresSpa Atlanta, which the parties also agreed would be payable in three installments: $250,000 payable on December 1, 2011; $200,000 payable on May 1, 2014; and subject to conditions, $200,000 payable on May 1, 2016.  Edwards and White offered Parks, Jr. and Jones, respectively, a 10%

interest in the reorganized Montclair in exchange for their agreement to each lend Montclair $25,000 towards the initial acquisition payment of $250,000.   This $25,000 loan represents the only monies Jones and Parks, Jr. contributed to the purchase of the acquisition.  Neither loaned Cordial monies for the second payment that was made in May 2014.

34.

Leading up to the final steps for the reorganization of Montclair, Parks, Jr. approached Edwards and White and informed them that his wife K. Parks would become the member of Montclair, participating in the transaction instead of him. Edwards and White initially questioned the change, but ultimately agree that Parks, Jr.'s wife could be the person participating under the same terms.  Later, Parks, Jr. sought to negotiate an increase in the respective 10% interest that Edwards and White had offered in the reorganized Montclair to 12.5 % for him and Jones. Parks, Jr. contended that the additional 2.5% interest in Montclair was fair, given that he and Jones had brought the ACDBE certified Montclair to the transaction and obviated the need for Edwards to move forward in organizing a new entity and applying for ACDBE certification. Edwards and White agreed to Parks, Jr.'s negotiation point.

35.

On or about November 17, 2011, Edwards, White, Jones, and Parks, Jr.
reached agreement to reorganize Montclair from a single member LLC, owned
solely by Jones, to a five-member LLC owned 39% by Edwards, 12.5% by Jones,
12.5% by K. Parks, 24% by White, and 12% by Mihir Goswami ("Goswami"), an
investor who White recruited to the transaction.   As reorganized, Montclair
remained ACDBE eligible under the ACDBE Regulations in that it was more than
51% owned and operated by socially and economically disadvantaged individuals
(Edwards 39%, Jones 12.5%, and K. Parks 12.5% = 64% ACDBE ownership).
The Montclair members set forth their agreements in an Operating Agreement
("Cordial Operating Agreement"), which was signed by all parties, including
Jones, the original owner.  The Cordial Operating Agreement is attached to this
Complaint as ***Exhibit 3.***

36.

The reorganized Montclair then entered into a purchase agreement with
XpresSpa Atlanta dated December 1, 2011 to purchase the 36%
membership/ownership interest in XpresSpa Atlanta for $650,000.  The parties
also entered into an Amended and Restated Operating Agreement (the "XpresSpa
Atlanta Operating Agreement" attached to this Complaint as ***Exhibit 4***).  Under the

ACDBE Program, a limited liability company with a majority (prime) concessionaire and an ACDBE firm as members is considered a joint venture. Thus, XpresSpa Atlanta will be referred to occasionally in this complaint as a joint venture or the XpresSpa Atlanta Joint Venture.

37.

When the acquisition was closed, the reorganized Montclair became a 36% owner in the A store, a business that averaged approximately $1.8 million in annual gross revenues.

38.

In November 2011, while final negotiations were underway for Montclair's acquisition of a 36% membership/ownership interest in XpresSpa Atlanta, the City issued two Requests For Proposals ("RFPs") for packages of three new spas each, one package consisting of new spa stores to be built and operated on the D, E, and F concourses at the Airport, and the other package consisting of new spa stores to be built and operated on the B, D, and T concourses at the Airport.   Under the rules of the RFPs, a single proponent could only be awarded one of the two packages.

39.

In January 2012, B&P worked closely together with Montclair and its
managing member, Edwards, to formulate and submit a proposal for the RFP
concessions package consisting of the D, E, and F stores.  On January 14, 2012,
then the President of XpresSpa, Marisol Binn, submitted XpresSpa Atlanta's
proposal to the City, which identified Cordial in the first paragraph of the
submission as a "certified Atlanta ACDBE" and expounded upon the joint
venture's partnership in the A Store.  (***Exhibit 5***).

40.

During the period around January and February 2012, B&P went through a
refinancing transaction.  Pursuant to this transaction, B&P's membership interest
in XpresSpa Atlanta was assigned to Holdings.  B&P eventually dissolved.

41.

At some point just prior to the submission of the XpresSpa Atlanta RFP
proposal for the D, E, and F stores, Parks, Jr. began fervently begging Cordial
members Edwards and White to allow K. Parks to withdraw from Montclair.
Edwards and White did not understand this request and refused to provide their
consent to K. Parks' withdrawal from Montclair.  Edwards and White reminded
Parks, Jr. that his involvement was as an investor only and that he had pledged that

his participation would not be problematic for the company.   After continued haranguing by Parks, Jr., Edwards and White remained unwilling to allow K. Parks to withdraw.  They did accede to a different request from Parks Jr., namely that K. Parks' background information not be included in the proposal submitted for the D, E, and F stores.

42.

Eventually in April 2012, after months of daily near-hysterical pleading by Parks, Jr. for K. Parks to be allowed to withdraw from Montclair, Edwards and White agreed to provide their consent with conditions.   Though the Cordial Operating Agreement dictated that K. Parks shares were to be reabsorbed by the company, Parks, Jr. demanded that he be allowed to substitute someone else in his wife's place.  After much discussion regarding bringing on someone new and unknown, Parks, Jr., introduced Wilson to Edwards, White, Jones, and Goswami. Parks, Jr. convinced them to assent to Wilson becoming a 12.5% member of Montclair in place of K. Parks.

43.

Parks, Jr. gave Edwards and White assurances yet again, this time it was that Wilson would be a good member and not cause problems for Cordial.  Prior to giving this consent, Cordial members Edwards, White, Jones, and Goswami

required K. Parks to submit a signed letter of agreement to Montclair promising that in exchange for being allowed to withdraw from Montclair, neither she, nor any one on her behalf, would interfere with Montclair or its business.  (*Exhibit 6*).

44.

The parties, now including Wilson, re-executed the Cordial Operating Agreement, with a retroactive effective date.  Upon becoming a member, Wilson did not remit any funds to Cordial for her membership interest, and Cordial is unaware of what funds, if any, Wilson remitted back to K. Parks for her shares. Thus, as of April 2012, once the Cordial Operating Agreement had been re-executed and given retroactive status, Montclair was owned 39% by Edwards, 12.5% by Wilson, 12.5% by Jones, 24% by White, and 12% by Goswami. Cordial continued to meet the ACDBE Regulations requirements as an ACDBE firm, in that it was still more than 51% owned and operated by socially and economically disadvantaged individuals (Edwards 39%, Jones 12.5%, and Wilson 12.5% = 64%). (The signature page of the re-executed Cordial Operating Agreement is attached as *Exhibit 7*).

45.

In June 2012, the City informed XpresSpa Atlanta that it was the winning proponent in the RFP for the D, E, and F stores.

20

46.

Also in June 2012, Montclair, in accordance with Section 4.2(f) of the Cordial Operating Agreement, amended its articles of incorporation to change its name to Cordial Endeavor Concessions of Atlanta, LLC.  XpresSpa was made aware of the company's name change to Cordial.

47.

Also, in June and July 2012, Cordial submitted paperwork to GDOT informing the agency that the company's ownership and name had changed. Jones, as the sole owner of the company when it originally obtained ACDBE certification status, agreed to update GDOT.  Jones signed and forwarded a letter to GDOT (*Exhibit 8*) setting forth the information on the ownership and name changes, along with an affidavit, signed under oath by each of the five members, attesting that the ownership changes had not removed the company's eligibility as an ACDBE firm.

48.

Unbeknownst to Cordial, during this time period, Jones experienced an almost immediate "buyer's remorse" regarding Cordial's reorganization.  After submitting the letter and affidavit to GDOT, she began secretly lobbying GDOT officials not to approve Cordial's ownership changes unless the members agreed to

21

allow her to remain in control of the company.  While telling GDOT one story, Jones was telling her fellow Cordial members something else.  She falsely represented to her fellow Cordial members that GDOT insisted that she remain in control of Cordial in order for the company to retain its ACDBE certification status. Jones was making these false assertions even though at this time she was (i) a minority owner in the reorganized company with 12.5% interest; (ii) she had only loaned the company one-tenth ($25,000) of the funds needed to purchase the interest in XpresSpa Atlanta; and (iii) her position articulated was completely contrary to the ACDBE Regulations.  Cordial would later find out that Jones had dishonestly stated to various City and GDOT officials that her company had been "stolen" from her.

49.

Jones' interference, which involved the assistance of her attorney (Williams), with GDOT's review of Cordial's ownership changes was persistent, purposeful, and the primary cause of GDOT's failure to act in accordance with its requirements under the ACDBE Regulations.  Though required to do so in accordance with the ACDBE Regulations, GDOT failed and negligently refused, to the detriment of Cordial, to act for more than two years on Cordial's submission

that reflected that the company continued to meet the requirements of ACDBE certification following its ownership and name changes.

50.

During the years 2012 and 2013, the XpresSpa Atlanta joint venture worked well together in ways contemplated by the ACDBE program. Cordial member Edwards collaborated with B&P on the preparation of the successful RFP for the D, E, and F stores. Edwards became involved in the A store operations and made major contributions to address serious management problems that existed at the store. In fact, Cordial member Edwards played a significant role in addressing a store crisis that occurred in September 2012, which resulted from the Airport concessions management staff shutting down the A store following workers' complaints about having to work in unsanitary conditions. With Edwards' intercession, the store was reopened within a few hours, which drew praise for her from the Airport management team and Holdings.

51.

Cordial, through its managing member Edwards, was active in the Airport's concessions management program, attending regularly scheduled concessions meetings, serving on the Airport marketing team (comprised of Airport management and concessionaire owners) and serving as a positive representative

for XpresSpa Atlanta.  Edwards enjoyed a positive relationship with the Airport general manager and his senior staff.  Also, Cordial, through its managing member Edwards, was also active in the governance of XpresSpa Atlanta, with the purpose of improving the performance of the A store, building a positive relationship within the concessions community, and elevating XpresSpa's image with the Airport concessions management.  Edwards worked in a constructive manner to build a good professional relationship with Holdings and its senior management. Edwards also lobbied Airport Management successfully for XpresSpa Atlanta A to be allowed to bid on an impending RFP for additional stores.

## 52.

For more than a year after the Atlanta City Council had approved the D, E, and F lease agreement with XpresSpa Atlanta, the lease inexplicably sat on Reed's desk for more than a year.  Finally, Reed executed the lease on behalf of the City in December 2013. (The body of the D, E, and F stores lease, as well as pertinent ACDBE materials, is attached as *Exhibit 9*).

## 53.

Under the ACDBE Regulations, the City was required, through its Office of Contract Compliance ("OCC") along with the Department of Aviation,  to conduct an annual Commercially Useful Function ("CUF") performance review of the

XpresSpa Atlanta joint venture to ensure that it was operating in the manner required under the ACDBE Regulations and to ensure that Cordial was performing a CUF within the joint venture. Out of the three years that Cordial had been a partner in the joint venture, the City had conducted only one of three mandated annual CUF performance reviews, which was done in September 2013. Representatives from both Cordial and Holdings participated in the CUF performance review. During this review, Holdings was very complimentary of Cordial and Edwards as its ACDBE joint venture partner. In general, the joint venture was given high marks and Cordial was found by the City to be participating in the joint venture in a manner commensurate with its ownership interest and profit participation. Notwithstanding the generally overall positive review provided by the City to the joint venture, it was in this meeting that XpresSpa Atlanta was told by the City that the joint venture's ACDBE participation goal was 40% in the A store lease and that this deficiency should be corrected. XpresSpa never took steps to correct this deficiency as directed by the City.

54.

In addition to the participation level, the City also questioned whether the joint venture was in compliance with some of the ACDBE Regulations. For

instance, the ACDBE Regulations required that the ACDBE firm participate in budget preparation and have some budgetary control as to the area of work it was performing.   Holdings had never allowed Cordial to participate in the yearly budget planning and refused Cordial's requests to be included in the process.  The ACDBE Regulations spoke to a joint venture bank account, which did not exist. The ACDBE Regulations required the ACDBE firm to have some purchasing authority on behalf of the joint venture, which Cordial did not have.  During the City's CUF performance review, the City and Airport representatives stated that both the prime concessionaire and the ACDBE concessionaire could and would be held accountable for regulatory noncompliance and directed the joint venture to address these deficiencies.

55.

Although Cordial agreed with the assessment that it was performing a CUF within the joint venture, Cordial also accepted the City's directives and concluded (i) that it needed to completely fulfill its roles and responsibilities and (ii) that it need to work with Holdings to address the deficiencies pointed out by the City to achieve full compliance with the ACDBE Regulations.  Based upon this review and the City's directions, Cordial sought to address these areas of concern,

however, it was unable to make any meaningful progress in resolving these issues
because of Holdings' resistance in doing so.

56.

In addition to participation level and proper joint venture roles and
responsibilities, there were several other business issues that existed between
Cordial and Holdings that required resolution.  First, there was an ongoing problem
with Holdings' commingling goods, services, and expenses on a regular basis
between the A store, in which Cordial had an interest, and the C store, which
Holdings operated 100% without the required ACDBE participation.   This
commingling did not allow for proper accounting and was occurring to the
detriment of Cordial.  When Cordial asked the store manager to inform it how the
goods and services were accounted for between the two stores, the email response
was that Holdings had told him to treat the stores as if they were one.  Thus, there
was no accounting method in place.  Second, the purchase price which B&P had
insisted on for Cordial to purchase its interest in the A store violated the ACDBE
Regulations in that it would have Cordial reimbursing Holdings for more than 80%
of the capital investment in the A store in exchange for only a 36% membership
interest.  Conversely, Holdings' 64% interest would ultimately have less than 20%
capital investment.  These terms were not in compliance with the regulations which

27

require that an ACDBE firm's capital contribution must be commensurate with its ownership.   Upon learning of this price discrepancy, the regulations regarding contribution and ownership being commensurate, and upon Holdings having issued a material restatement of XpresSpa Atlanta projected earnings in April 2013, Cordial sought from Holdings an appropriate purchase price adjustment based on these conditions.   Third, Cordial became aware that Holdings was secretly pursuing additional business opportunities at the Airport with other ACDBEs and electing not to honor Cordial's right of first offer to participate in such opportunities as set forth in the XpresSpa Atlanta Operating Agreement.

57.

In December 2013, following needlessly antagonistic communications by Holdings to Cordial on these issues, Cordial sought out the advice of the City. Specifically, Cordial members Edwards, White, and Wilson met with then Airport General Manager Miguel Southwell, along with some of his senior staff, to apprise them of the joint venture problems and to seek assistance in addressing the issues in a positive and constructive manner with Holdings.   In seeking out this meeting, Cordial acted within its rights under the federal ACDBE program.   Cordial informed Holdings of its meeting with the Airport management and their recommendations, which angered Holdings greatly.   In a meeting with White in

28

New York, Moreton Binn complained bitterly that in all of the years of XpresSpa's business, it had never had one of its ACDBE partners go to an airport to complain about it.  Shortly following this, Holdings began a campaign of retaliation against Cordial which has continued to the present time.

58.

As an essential part of Holdings' crusade to end Cordial's membership/ownership in XpresSpa Atlanta, Holdings began a cruel, mean-spirited, and vindictive campaign to vilify Edwards.  "Truth" was no deterrent in this campaign, as Holdings made numerous demonstrably false and malicious statements in this unconscionable effort.  This malicious effort began in early 2014 and has never abated.  These false and malicious attempts to vilify Edwards included, but were not limited to, the following matters: (i) Marisol Binn fabricating an outright lie that Edwards had threatened to come to New York to assault her following a conversation between the two regarding Cordial's desire to be trained on the A Store point of sale system.  Mrs. Binn's comments were outrageous and completely disproven by contemporaneous communications between the two, yet Holdings repeated this false statement over and over again to the City; (ii) XpresSpa asserted to the City that Edwards' effort to prevent an employee (massage therapist), who was not supposed to have access to the store's

29

point of sale system, from having such access was Edwards' creating a "hostile"

working environment for this employee; when such employee finally gained access

to the A store's point of sale system after Holdings blocked Edwards from

participating in the store's management and operations, this employee embezzled

tens of thousands of dollars from the store including ordering a massage chair

(Billed to the A Store) that he had delivered to his home; (iii) Holdings told the

City that Edwards had created legal exposure for XpresSpa Atlanta by failing to

report a workers compensation claim on a timely basis, when emails clearly

demonstrate that Holdings and Cordial were notified of the claim at exactly the

same time by Holdings' regional manager and A store manager; (iv) Holdings

asserted that Edwards controlled the management of the A Store and that the Store

was financially underperforming because of her, notwithstanding that Cordial was

not involved in any budgeting preparation for the store and as has been noted

earlier, neither Cordial nor Edwards on Cordial's behalf had control over a single

dollar of the store budget, and Holdings admitted in emails and discussions that it

had done a poor job of hiring store employees and otherwise managing the store;

and (v) Holdings falsely asserted that OCC had instructed Holdings not to meet

with Cordial in a session scheduled to discuss the XpresSpa Atlanta joint venture

issues, and when an inquiry was made to OCC by Cordial, OCC's Director

informed Cordial that he had told Holdings the exact opposite.  Holdings later confessed that it was Holdings and its attorney's (Coleman) decision not to meet with Cordial.  This vilification campaign which was targeted at Edwards was done with the specific intent to injure and harm her and Cordial and was occurring with the City's knowledge.

59.

In April 2014, Holdings began raising questions about Cordial's ACDBE certification status.  Contemporaneously with making this inquiry, Holdings made a demand on Cordial for their second payment of $200,000 under the XpresSpa Atlanta Purchase and Sale Agreement.  Cordial informed Holdings that Cordial was ACDBE certified, noted that GDOT continued to list the firm on the agency's ACDBE registry under its original name, Montclair, and informed Holdings that it had submitted the appropriate paperwork for the update of GDOT's ACDBE registry in the summer of 2012.  Cordial also timely made the second installment payment of $200,000 via wire transfer in response to Holdings' demand.

60.

Despite the fact that Cordial remained ACDBE certified and had timely remitted the $200,000 second installment payment, Holdings and its attorneys continued to raise questions about Cordial's certification status and began

affirmatively asserting, without any bases, that Cordial was not ACDBE certified. Also, Holdings' position lacked legal merit, both under Georgia corporate law and the ACDBE Regulations.  Cordial rejected these assertions as it steadfastly and correctly maintained that it was ACDBE certified.  It also forwarded Holdings copies of the ACDBE regulations to provide its joint venture partner clarification on the issue they were raising, but Holdings rejected this information.  Instead, Holdings was singularly focused on manufacturing an ACDBE issue, where one did not exist, for the sole purpose of creating an avenue to retaliate against Cordial by terminating it from the joint venture.  Neither the City, GDOT, nor the FAA had raised concerns regarding Cordial's certification, only Holdings.  It was Holdings who relentlessly did so under the disingenuous guise of being concerned about the ACDBE program.  This is the same Holdings that had just signed the Second Amendment a few weeks prior to trying to terminate Cordial.  This is the same Holdings that has spent the majority of their years of the Airport contract (i) violating the rules and regulations of the federal ACDBE program; (ii) blocking ACDBE's from participating and enjoying their share of the contracts; and (iii) appropriating funds that were earmarked for ACDBE's participating in this federally protected program.

61.

During the period of time from September 2013 through the spring of 2014, Wilson consistently expressed her views, both verbally and in writing, that Cordial was on the right side of the business and legal issues in its dispute with Holdings. In one of her more pointed email statements, Wilson wrote that allowing Holdings to make certain questionable expenditures against the XpresSpa Atlanta budget was tantamount to Cordial "*financing its own oppression*" (**Exhibit 10**).

62.

In the late spring and early summer of 2014, a conspiracy arose that involved Holdings, Holdings' legal counsel (Michael Coleman), Parks, Jr., and Wilson. Parks, Jr. and Coleman, who are neighbors, had begun to confer regularly about the Holdings/Cordial dispute. Eventually, the object of the conspiracy was that (i) Parks, Jr. and Wilson began to align themselves with and support Holdings in its efforts to end its business relationship with Cordial; (ii) Parks Jr. would use his influence with his childhood friend, Reed, to turn the City against Cordial; and (iii) in return, Holdings would replace Cordial with Wilson and Parks, Jr.

63.

Parks, Jr. stood to benefit financially from this conspiracy. On information and belief, Parks, Jr. maintained a hidden ownership interest in Wilson's

membership in Cordial.   Parks, Jr.'s participation in this conspiracy adverse to Cordial was in direct violation of his wife K. Parks' written commitment that no one acting on her behalf would be involved in Cordial's affairs. (***Exhibit 6***).

64.

With its superficial pretext of supporting the federal ACDBE program, Holdings was highly concerned about having a public dispute with yet another ACDBE firm at the Airport and took acts in furtherance of the conspiracy to have Wilson and Parks, Jr. become its endorsers, while it demeaned and disparaged Cordial and its members Edwards and White.   Holdings began offering Wilson travel, perks, and other things of value, which she willingly accepted.   In turn, Wilson altered her position completely about Holdings' transgressions against Cordial.   Further, Wilson, in conjunction with Holdings, began to purport to make joint venture decisions binding as to Cordial, even though she (i) was not the president or managing member of Cordial; (2) had no governance authority to make decisions for Cordial; and (iii) held only a 12.5% interest in Cordial.   By late summer, Holdings had declared to Cordial and the City that it would only work with Cordial, through Wilson, a position in complete disregard of Cordial's rights to independent governance of its affairs and in direct defiance of the ACDBE Regulations.   Holdings attorney also sent emails to the City describing Azure as

34

Holdings' new ACDBE partner. Cordial filed a complaint with the City's OCC regarding Holdings' interference in Cordial's internal governance and their attempt to replace Cordial with one of its members.  The City's OCC did nothing to address the situation.

65.

In the spring of 2014, as Holdings began to challenge Cordial's certification status, Cordial timely submitted its required annual documents to GDOT and again requested that the agency act upon the information Cordial had submitted to GDOT in the summer of 2012 by updating its ACDBE registry to reflect Cordial's ownership and name changes.

66.

Consistent with her misconduct in 2012, Jones continued to work against Cordial's interests in 2014.  Unbeknownst to Cordial at the time, in June 2012, within days after Cordial had changed its name from Montclair, Jones organized a new company, MD-Jones, of which she was the sole owner.  Jones gave the new company Cordial's previous name Montclair Douglas in an attempt to confuse GDOT and to appropriate Cordial's business interest.  In the years 2013 and 2014, Jones and Williams intentionally sought to mislead GDOT into recognizing her new company as the ACDBE certified firm listed on the GDOT registry as

Montclair. Without Cordial's permission, Williams illegally released private Cordial documents to GDOT, which documents had not been requested by the agency. These documents were quickly seized and improperly used by Holdings' attorney to bolster Holdings' false assertion that Cordial was not ACDBE certified. In numerous communications, Holdings' attorneys misused and misrepresented the contents of these documents to GDOT, USDOT, the City, and the Federal Aviation Administration ("FAA") in an unrelenting pursuit to label Cordial as not certified as an ACDBE. On information and belief, the action by Williams in releasing these private documents was an intentional act taken on behalf of Jones to place Cordial's private documents in the public domain, so that they could be obtained and weaponized by Holdings' attorney, as part of Jones and Williams' efforts to provide assistance to Holdings adverse to Cordial.

67.

Cordial corresponded with GDOT several times citing the ACDBE Regulations and setting forth the correct analysis and information regarding the firm's ACDBE certification status, i.e., Cordial's name change did not make it a different legal entity under Georgia law and *49 C.F.R. § 26.83(h)* provided that Cordial remained certified until it was decertified. Jones and Williams likewise corresponded with GDOT opposing Cordial's efforts to have GDOT update its

registry.  Unbeknownst to Cordial, during this period of time, Holdings' attorney (Coleman) was also lobbying a senior executive at GDOT for the agency to take adverse action on Cordial's ACDBE certification.  Influenced by the actions of Jones, Williams, and Coleman, GDOT failed to take any action.

68.

In June 2014, the City circulated to XpresSpa Atlanta a proposed Second Amendment to the A store lease. (the "Second Amendment" attached hereto as **Exhibit 11**). Holdings executed this lease on behalf of XpresSpa Atlanta.  The Second Amendment articulated a policy that if an ACDBE firm had problems with its ACDBE certification, the prime concessionaire and the City should work with the ACDBE firm in addressing such issues.  On July 1, 2014, Holdings, in complete disregard of (i) having demanded and received the second installment of $200,000 in April 2014 and (ii) the policy set forth in the Second Amendment, unilaterally declared that it was terminating Cordial's membership/ownership interest in XpresSpa Atlanta because of Holdings' fabricated contention that Cordial was not ACDBE certified.  Cordial replied that the purported termination was legally invalid.  Later in August 2014, Holdings stated that it was adjusting Cordial's termination date to October 5, 2014 to give Cordial time to address its ACDBE certification status.  Cordial rejected this position as well and maintained

that it was certified and had never been decertified by GDOT.  Cordial also brought this termination matter to the City's attention, but it failed and refused to take any action.

69.

GDOT continued its failure to update its ACDBE registry to reflect Cordial's ownership and name changes.  In the fall of 2014, GDOT strongly intimated that Cordial filing a new application for ACDBE certification would break the impasse and lead to GDOT's recognition of Cordial's ACDBE certification status.

70.

Notwithstanding the fact that Cordial knew that it remained certified as an ACDBE firm under the ACDBE Regulations and applicable state law, Cordial, under express protest, filed a new application for ACDBE certification in September 2014.  Following a minimal review by GDOT's staff and continuing interference and lobbying of officials at the agency by XpresSpa's lawyer, GDOT rejected Cordial's ACDBE application on November 9, 2014.

71.

During the summer of 2014 through October 2014, while it was improperly raising issues about Cordial's ACDBE certification status, Holdings decided that it would launch a new retaliation against Cordial, this time it was financial retaliation.  Holdings began diverting management fee moneys payable to Cordial (3.6% of monthly gross sales) away from Cordial's business office and instead sent these moneys to Wilson's home address as a reward for her betrayal of Cordial. Cordial immediately notified OCC, which office is responsible for ensuring compliance with the ACDBE Regulations.  OCC refused to enforce with Holdings the ACDBE Regulations and its own policies regarding proper payment of moneys to ACDBE firms.  Cordial also made numerous demands on Wilson, who refused for several months to remit these moneys to Cordial's corporate office.

72.

Since October 2014 until the present time, Holdings has not remitted management fees due to Cordial.  Instead, they have illegally diverted these funds to Azure, Parks, Jr., and MMC.  Since 2014, Holdings has not remitted to Cordial its share of profit distribution from the joint venture XpresSpa Atlanta.  Instead, it has illegally diverted these finds to Azure, Parks, Jr., and MMC.  The City was made aware of the diversion of funds due to Cordial, but the City refused to act.

Since 2014, Holdings has maintained that Cordial has been terminated, even though Holdings has continuously worked with a Cordial member, Wilson, throughout this entire period of time. Cordial repeatedly made Holdings aware that Wilson was still a member of Cordial. Undaunted Holdings proceeded, even though they knew that Wilson remained a member of Cordial and that she was in breach of her fiduciary responsibilities owed to Cordial and her fellow Cordial members. Holdings' actions in this regard were in furtherance of the conspiracy with Holdings, Wilson, Parks, Jr., and Jones to injure Cordial.

73.

In February 2015, Cordial, pursuant to its appeal rights under the ACDBE Regulations, prepared to file an appeal to USDOT of GDOT's denial of Cordial's September 2014 ACDBE application. On the eve of Cordial's deadline to file its appeal with USDOT, Jones, acting in conspiracy with others, including but not limited to Holdings, Azure, Wilson, and Parks, Jr., sent a demand letter to Edwards demanding that she cease and desist from acting on behalf of Cordial in filing an appeal with the USDOT, and falsely claiming that she (Jones) was the sole owner of Cordial and the only person authorized to act on behalf of the company. This patently libelous letter also accused Edwards of "identity fraud". Jones' widely circulated her defamatory letter to Holdings, GDOT, USDOT, FAA, the Internal

Revenue Service, the Georgia Department of Revenue, the City, and Cordial's bank (Fidelity National Bank).

74.

This letter was maliciously designed to injure Cordial and Edwards and to interfere with Cordial's appeal of GDOT's decision. Like Wilson, Jones was then, and remains now, a member of Cordial. Her grossly improper action was in complete violation of her fiduciary duties to Cordial and her fellow Cordial members. As a sign of its desperation, dishonesty, and collusion with Cordial partners Jones and Wilson, Holdings referenced this letter in an attempt to paint Cordial in a negative light in several of its writings to the City, even though Holdings knew or should have known that the letter was manifestly false. Holdings' actions in this regard were in furtherance of the conspiracy with Holdings, Wilson, Parks, Jr., and Jones to injure Cordial.

75.

At some point in the late winter, early spring of 2015, the City hired William K. Whitner ("Whitner") of the law firm Paul Hastings, LLP to represent the City with respect to the Cordial/Holdings dispute. Like Parks, Jr., Whitner is a close friend of Reed. Whitner lacked any meaningful experience in ACDBE matters

prior to being hired and failed to understand the application of the regulations of the federal ACDBE program.  Since being hired, his primary role appears to have been to provide the City with cover for its continued noncompliance with the ACDBE Regulations.  Since representing the City in this matter, Whitner's firm has billed the City more than $1 million in legal fees during the course of his representation, and his billing of fees to the City regarding this matter continues to this day.  As reflected in most of his communications to the FAA, Whitner's lack of experience and understanding of (i) the ACDBE Regulations and (ii) the role of Airport Sponsors in this federally protected program contributed to the City being continuously found by the FAA to be out of compliance with the governing regulations of the ACDBE Program.  Whitner has committed to writing, and the City has willingly accepted legal positions that are frivolous and completely inconsistent with the plain meaning of the ACDBE Regulations.  In addition to his writings being in violation of the ACDBE Regulations, they encroach upon the City's own adopted rules and regulations.    Reed used Whitner as a cudgel in Reed's efforts to destroy Cordial's business interest in XpresSpa Atlanta and to promote Holdings' and Parks, Jr.'s interests despite (i) Holdings' well documented violations of the ACDBE Regulations at the Airport and (ii) the repeated directives to the City by the FAA to enforce Cordial's contract.  Also, as will be detailed in

paragraphs below, Whitner became a willing collaborator with Holdings' attorney (Coleman) in the sustained and malicious effort to destroy Cordial's business interests.

76.

On April 1, 2015, the City issued a notice to Holdings of the termination for convenience of all three of XpresSpa leases (A Store lease, C store lease, and D, E, and F store leases) at the Airport effective April 30, 2015.  The termination for convenience notice was issued by the City to Holdings without any prior knowledge on Cordial's part.  Holdings did not share the termination notice with Cordial. After it got wind of the existence of the termination notice, Cordial asked the OCC to provide the company with a copy that it was entitled to receive.  OCC directed Cordial to file an Open Records Act request to obtain it.

77.

On April 7, 2015, following Holdings purported termination of Cordial from XpresSpa Atlanta and following the City's termination for convenience notice of the XpresSpa leases, Moreton Binn, on behalf of Holdings, sent an email to Miguel Southwell (then the Airport's General Manager) stating that Edwards and Cordial were no longer able to be "disruptive", Wilson (Azure) was Holdings' new ACBDE business partner, and Parks, Jr. was their new "business advisor" of the

43

venture. (**Exhibit 12**).  On April 18, 2015, Cordial filed a complaint with the FAA

Office of Civil Rights contending that the City was not in compliance with its

obligations under the ACDBE Regulations and that it had improperly allowed

Holdings to terminate Cordial.

78.

During the period between April 1, 2015 and June 23, 2015, the City and

Holdings were in constant discussions and a friendly negotiation to rescind the

termination for convenience notice.  During this period of negotiation, both the

City and Holdings refused to have any meaningful communication with Cordial

regarding these discussions, though the XpresSpa Atlanta Operating Agreement

required Cordial to be involved in discussions regarding its business.    Whitner

also sent communications to Cordial's attorney that members of Cordial were

directed not to contact any City or Airport officials under any conditions because

the parties were now ***"adverse to each other"***.  These comments by Whitner again

reflected his lack of understanding of the ACDBE program as the regulations

authorize ACDBEs to communicate with the program Sponsor when issues arose.

These comments by Whitner were also part of the ongoing plan by the City to keep

Cordial in the dark about what was transpiring with its business interest.

Unbeknownst to Cordial at the time, the City and Holdings had reached a secret

agreement which they began executing.  Cordial would find out later via open records act documents the terms of the City/Holdings deal.  Holdings offered to increase the ACDBE ownership percentage in XpresSpa Atlanta to 45% in exchange for the City allowing Holdings to terminate Cordial and substitute Azure and MMC (each as 22.5% ACDBE partners) in XpresSpa Atlanta. (*Exhibit 13*). The City and Holdings also reached an agreement that XpresSpa Atlanta would indemnify the City from any expenses or losses that might arise from Cordial suing the City and challenging its purported termination.  Holdings' attorney sent a letter to the City confirming the indemnification.  (*Exhibit 14*). which the City did not object to nor contradict as an accurate understanding of the parties' agreement. What became evident was the City's willingness and support in the Holdings' conspiracy to take Cordial's investment of $450,000 and award it to Reed's friends.

79.

In May 2015, during the midst of the City/ Holdings secret negotiations, GDOT issued a letter to Cordial rescinding its November 2014 denial of Cordial's ACDBE certification application.  (*Exhibit 15*).  GDOT had conferred with USDOT and determined that Cordial had indeed been continuously certified since April 2011 (as Cordial had consistently maintained to the City and XpresSpa) and

45

that GDOT should not have required Cordial to file a second ACDBE application. Also, in May 2015, USDOT also issued a letter to Cordial and ruled that its appeal submission was now moot in light of GDOT's rescission of its denial and its recognition of Cordial's continued ACDBE certification status.   (***Exhibit 16***). Within a day of receipt by Cordial, both documents were provided to the City and Holdings.

80.

Despite the fact that Cordial's continuous ACDBE certification status had been conclusively verified by GDOT and USDOT in May 2015 and any ambiguity removed, Holdings continued to maintain that its termination of Cordial was proper and the City continued to entertain Holdings in this falsity.  Following USDOT's letter in May 2015, Coleman contacted USDOT in a desperate attempt to convince USDOT to reverse itself and render a decision adverse to Cordial on the ACDBE certification issue.  Offended by Holdings' contacts with his office, a senior USDOT official reprimanded and rebuffed Coleman for his improper interference by stating in an email to Coleman: ***"I take exception to your quoting me out of context…in [the Cordial ACDBE certification matter in] which you represent neither party.  I am sure that you know that our office handles DBE appeals and your client has none before us . . . Please desist in attempts to***

***involve this Office in your ongoing disputes in Georgia.".***  (***Exhibit 17***).  The City, as the sponsor of the Airport's ACDBE Program, acquiesced and did not challenge Holdings' position.  Holdings continued its refusal to remit management fee income and profit distributions to Cordial.  Holdings continued to treat Azure (Cordial's 12.5% member Wilson's firm) as if it was the 36% ACDBE partner in XpresSpa Atlanta, rather than Cordial (pending the increase in ACDBE ownership percentage to 45% and the proposed addition of MMC as an entity substituted for Cordial). City officials continued to take no actions to bring Holdings into compliance with the ACDBE regulation.  The City, Reed, Holdings, Azure, Wilson, MMC, Hutchinson, Jones, MD-Jones, Parks, Jr., and others continued to conspire with each other to harm Cordial's business interests.

81.

Despite the fact that Cordial's continuous ACDBE certification status had been conclusively verified by GDOT and USDOT in a manner that was consistent with Cordial's stated position to Holdings and the City, the City continued to support Holdings' position that it had terminated Cordial.  The City maintained this position despite the fact that Holdings had never sought, and the City had never issued, a written finding of good cause for Cordial's termination, as required by ***49***

*C.F.R. § 26.53(f),* which sets forth both procedural requirements and substantive restrictions on when a prime concessionaire can terminate an ACDBE firm.

82.

Within a few days of receiving Holdings' confirmation of its indemnification undertaking as to a possible Cordial lawsuit, the City, on June 23, 2015, rescinded its termination for convenience of the three XpresSpa leases.  On this same date, Whitner emailed Coleman (Holdings' attorney) the Substitution Forms to swap out Cordial.  Acting consistently with the agreement that it had reached with the City, Holdings promptly submitted paperwork to substitute Azure and MMC, as its ACDBE members in XpresSpa Atlanta in place of Cordial.  Also, consistent with the agreement that Holdings had reached with the City, it purported to raise the ACDBE percentage in the joint venture to 45% (from Cordial's 36%) and divided it between Azure and MMC, 22.5% each.

83.

At the time that Holdings submitted paperwork proposing to substitute Azure and MMC for Cordial, the City, Reed, Holdings, Azure, Wilson, MMC, Hutchinson, Jones, MD-Jones, and Parks, Jr. knew that Cordial's ACDBE certification status was confirmed as a matter of law by GDOT, the certifying agency, and by USDOT, GDOT's reviewing agency.  Records reflect that none of

48

the conspirators addressed Cordial's $450,000 capital investment as they cemented plans to misappropriate Cordial's business for Reed's friend and partners.

84.

After Holdings' contention that Cordial was not ACDBE certified was conclusively refuted by GDOT and USDOT's pronouncements, Holdings quickly abandoned this meritless and false position and asserted that its grounds for seeking Cordial's termination was a *"performance default"*.  After conferring with other conspirators, Holdings quickly realized that its contention of a *"performance default"* was also meritless and false.  Within a matter of a few days, Holdings submitted amended paperwork stating its grounds for Cordial's termination was a *"contract default"*.  This new and still false allegation was a continued attempt by Holdings to rehash Cordial's ACDBE certification status, which had already been confirmed by GDOT and USDOT, the true regulating authorities as to the issue of certification.

85.

In response to Holdings' paperwork seeking substitution for Cordial, Cordial wrote to the City that there were no valid grounds for Holdings to request Cordial's termination or for the substitution of Azure and MMC for Cordial.  Moreover,

Cordial stressed repeatedly to the City that it was not in compliance with *49 C.F.R. § 26.53(f)*.

86.

The City finally accepted and acknowledged its noncompliance with *49 C.F.R. § 26.53(f)* by returning the substitution paperwork to Holdings in July 2015 and informing Holdings that it was required to comply with the requirements of *49 C.F.R. § 26.53(f)*.   (*Exhibit 18*).

87.

On August 3, 2015, Holdings, as required by *49 C.F.R. § 26.53(f)*, sent Cordial a letter regarding Holdings' request to terminate Cordial and substitute other firms. Cordial responded in writing to Holdings and the City why the requested grounds to terminate were factually and legally invalid. Subsequent letters ensued between Holdings and Cordial setting forth the parties' respective positions.

88.

After Cordial and Holdings had submitted their respective letters on the issue of Cordial's termination, the City, rather than reach the conclusion that the facts demanded, i.e., there was no good cause for Cordial's termination, instead

decided to punt the ball down the field by ordering the parties to mediation, which was conducted on December 1, 2015.  The City and its outside counsel attended the mediation but it did so only to give the perception that they were trying to assist the parties in working out their differences.  Even though it requested the parties attend the mediation, the City refused to meaningfully participate in the session and failed to show any leadership towards resolution of the matters between the parties.  Instead, approximately ten City officials, led by the City's outside counsel, Whitner (presumably billing Atlanta taxpayers for each minute), chose to sit together in a room down the hall for over eight  hours without ever substantively engaging Cordial on any issue related to parties' dispute or without attempting to fulfill the City's mandatory stewardship role as a Sponsor of the federal ACDBE program.

89.

On December 18, 2015, the FAA issued its investigative report on Cordial's complaint against the City.  (***Exhibit 19***).  The FAA found that the City was indisputably noncompliant with the ACDBE Regulations in numerous respects: (i) It found that the City had never reviewed the joint venture agreements for compliance with the ACDBE Regulations; (ii) It found that the City had not appropriately monitored the joint venture; (iii) It found that the City had only

conducted one annual performance review in the three years of the existence of the joint venture; (iv) It found that the City had not investigated Cordial's complaints of retaliation against Holdings; (v) It found that Holdings had violated *49 C.F.R. § 26.53(f)* by purporting to terminate Cordial without a prior written finding of good cause; and (vi) It found that the City was noncompliant with the ACDBE Regulations by acquiescing in Holdings' purported termination action.  The FAA directed the City to enforce Cordial's joint venture agreement with Holdings and ensure payment of all outstanding moneys due to Cordial.  The FAA also directed the City to take corrective actions to address its noncompliance with the ACDBE Regulations.

90.

In response to the FAA's report, the City issued a Corrective Action Plan ("CAP") in January 2016.  The first several pages of the CAP were a harangue by the City against Cordial, which clearly evidenced the City's bias, antagonism and hostility towards Cordial.  The balance of the CAP stated that the City would conduct two hearings, a non-evidentiary hearing on Cordial's claim of retaliation against Holdings and an evidentiary hearing on Holdings' request to terminate Cordial and substitute other firms.  The CAP intentionally ignored the FAA's mandate that the City enforce Cordial's rights in the XpresSpa Atlanta Operating

Agreement (i.e., direct Holdings to pay Cordial the amounts due under the agreement) and to review the joint venture agreements for compliance with the ACDBE Regulations.

91.

After reading the City's disparaging passage about Cordial set forth in the CAP, Cordial called upon the City to recuse itself from the proposed administrative hearings. Cordial also communicated its concerns to the FAA that the City had obviously become aligned with and a partisan for Holdings and biased against Cordial. Recognizing the City's bias, the FAA also requested that the City recuse itself. In a letter to the FAA dated February 25, 2016, the City rejected both requests. (*Exhibit 20*).

92.

On the eve of the first hearing on Cordial's claims of retaliation, Cordial received a copy of Holdings' mediation statement for the December 1, 2015 mediation in response to a Georgia open records act request (Excerpts from mediation statement are attached as *Exhibit 21*). Holdings' attorney had copied city officials on the document and converted what would otherwise have been a private document into a public record. This mediation statement confirmed the collusion between the City and Holdings and described in great detail the

agreement that the City had reached with Holdings in June 2015 to rescind the termination for convenience of XpresSpa leases in exchange for, among other things, allowing the termination of Cordial and a letter of indemnification from XpresSpa Atlanta.

93.

Upon learning that the City and Holdings had already reached an agreement as to an ultimate issue in the Cordial/ Holdings dispute (i.e., whether good cause existed for Cordial's termination and substitution of other firms), which it had not disclosed to Cordial or the FAA, Cordial intensified its demand that the City recuse itself from the hearings.  The City continued its refusal to recuse itself and insisted upon serving as the arbiter of the disputes between Cordial and Holdings.

94.

The City failed to conduct an investigation of Cordial's retaliation complaints prior to the hearing.  The City also failed to interview Cordial regarding Holdings' more than 30 retaliatory acts against Cordial.  In February 2016, the City conducted a *non-evidentiary* hearing on Cordial's complaint of retaliation against Holdings.   Following the hearing, the City issued a predictably biased ruling completely in favor of Holdings and against Cordial.  The ruling attempted to

address only a handful of Cordial's specific claims of retaliation by Holdings, while the vast majority of these claims were completely ignored by the City.

95.

One of Cordial's claims of retaliation against Holdings pertained to Holdings issuance in April 2015 of Cordial's K-1 for its share of partnership income for the tax year 2014.  Cordial's 2014 K-1 reported that its share of partnership income was $159,127.  However, Holdings refused to distribute these funds to Cordial.  As a result, Cordial members had to recognize taxable income on moneys Cordial had not received.  At the non-evidentiary hearing, Holdings claimed that it was justified in this improper action on the doctrine of "phantom income", which was wholly inapplicable to the facts at hand.  However, the City accepted Holdings' specious rationale, lock, stock, and barrel, and so noted in its biased, partial ruling.

96.

Later in February 2016, the City conducted the evidentiary hearing on Holdings' request to terminate Cordial.  Cordial member Wilson appeared as a Holdings witness and provided false testimony as part of her continuing conspiracy to injure Cordial and to appropriate Cordial's business opportunity for Azure, Parks, Jr., and herself.  In a blatant demonstration that the *fix was on* against

55

Cordial and in favor of Holdings, Holdings' attorney (Coleman) in a disinteresting manner read the newspaper during most of the hearing.  In the City's unrelenting effort to manufacture justification to rule against Cordial, the City spent a substantial part of the hearing raising issues about Cordial's ACDBE certification status, which status had been resolved by GDOT and USDOT in May 2015.

97.

Following the termination hearing, the City predictably issued another one-sided ruling in favor of Holdings and against Cordial.  As an example of the City's intractable bias against Cordial, it credited Wilson's testimony as important to its ruling, notwithstanding the glaringly obvious conflict of interest Wilson had and her conspicuous violations of fiduciary duties to Cordial and her fellow Cordial members.

98.

Further evidencing its intention to disregard the ACDBE Regulations and to reach an outcome adverse to Cordial, and notwithstanding the applicable law and facts, the City arrogantly asserted to the FAA the position that the City's biased rulings were final and beyond any administrative review by the FAA.  This position was completely contrary to the express authority that the FAA reserved in

its December 2015 investigative report and the express authority set forth in USDOT regulations granting the FAA with oversight authority over airports' determinations of whether good cause exists for the termination of an ACDBE firm under *49 C.F.R. § 26.53(f)*.

99.

In letters dated May 5 and May 18, 2016 and an email dated June 1, 2016, the FAA wrote the City and instructed it not to implement or take any further action relative to the rulings from the two hearings until the FAA had conducted and completed its review of the City's implementation of the CAP.   (*Exhibit 22*).

100.

In August 2016, FAA officials traveled to Atlanta and conducted three separate meetings, one each with the City, Holdings, and Cordial to discuss the ongoing dispute.   Wilson, a member of Cordial, was also present at the FAA meeting with Holdings.

101.

On October 4, 2016, the FAA informed the City that its CAP implementation had been *unsatisfactory* in a number of material aspects and that the City remained noncompliant with the ACDBE Regulations.   (*Exhibit 23*),

Among other things, the FAA informed the City that it had failed to conduct the mandated review of the XpresSpa Atlanta joint venture documents for purposes of assuring compliance with the ACDBE Regulations.  The FAA noted that the City had taken no steps to enforce Cordial's contract rights and ensure payment of monies due to Cordial.  The FAA noted that the City had not investigated the vast majority of Cordial's retaliation claims against Holdings.  The FAA recognized that the City was not an impartial arbiter in the two hearings and rejected both of the City's rulings.  The FAA ordered the City to retract such rulings and to have the hearings conducted before an independent neutral third party.  The FAA also admonished the City for raising issues about Cordial's ACDBE certification status in the hearing and in the ruling, stating in plain terms that Cordial is and has been an ACDBE.

102.

The City's purported concern about Cordial's ACDBE certification was a pretext and also harmful to the City in that the FAA has prohibited the City from counting any ACDBE participation on the A store concessions agreement since October 2014, when Holdings improperly purported to terminate Cordial's membership interest in XpresSpa Atlanta.  Although the City has wrongfully allowed Azure and MMC to operate in the A store with Holdings and to receive the

profit distributions and management fee income due Cordial, the City has not been able to count with the FAA any ACDBE credit for unentitled ACDBE's Azure and MMC's activity due to the City's noncompliance with the ACDBE Regulations, its unsatisfactory implementation of the CAP, and its defiance of the FAA's directives.  It is also noteworthy that the only time that XpresSpa Atlanta has had creditable ACDBE participation in the A store has been when Cordial was active in the joint venture.  In fact, despite Holdings' self-serving pronouncements about its unwavering support for the ACDBE program, both XpresSpa Atlanta and XpresSpa-JDEE went considerable portions of time since 2008 without the required ACDBE participation, including periods when B&P or Holdings pocketed 100% of the revenues and profits from these companies, notwithstanding the City's ACDBE participation requirements.

103.

Following this October 2016 letter from the FAA, the City wrote back to the FAA continuing to defy their directives and refusing to take measures to come into compliance with the ACDBE Regulations.  Among other things, the City amended its ruling on Cordial's retaliation complaint against Holdings, by summarily rejecting, without any investigation, Cordial's claims which the FAA had found the City had not investigated in the first instance.  Holdings likewise wrote a letter to

the FAA insisting upon remaining noncompliant with the FAA's ruling and directives.

104.

On November 9, 2016, the FAA again wrote to the City restating its prior findings and directives.  (***Exhibit 24***).   Undaunted and obstinate, the City and Holdings each sent letters continuing to defy the FAA's directives, and instead, both demanded a meeting with the FAA's deputy administrator over the area of civil rights.  In a letter dated December 28, 2016, the FAA refused this request but offered its mediation services to the City and Holdings.  (***Exhibit 25***).

105.

In December 2016, Holdings was acquired by a private equity firm, Form Holdings, LLC ("Form").  Instead of taking immediate steps to bring Holdings into compliance with its contractual obligations to be governed by the ACDBE Regulations and the FAA Office of Civil Rights' findings and rulings in its December 2015, October 2016, and November 2016 written communications, Form caused Holdings to file a lawsuit against Cordial, Edwards, White and Goswami in New York Supreme Court.  Of course, Holdings did not sue its co-conspirators Cordial members Wilson and Jones.   Holdings' lawsuit was misleading and dishonestly pled.  As one glaring instance of Holdings' lack of

candor to the court, Holdings asserted that Cordial was not ACDBE certified by relying upon the November 2014 GDOT ruling, but deliberately omitting from its complaint and the courts view any mention of the May 2015 GDOT ruling rescinding its earlier ruling.  Holdings contended that it had suffered monetary damage at the hands of Cordial based upon the City's refusal to allow the D, E, and F stores to have been built and opened.

106.

Holdings forwarded copies of the lawsuit to the City, who in turn promptly forwarded the lawsuit to the FAA.  The City, continuing to collude with Holdings, declared that the pendency of this lawsuit should cause the FAA to suspend its proceedings to bring the City into compliance with its obligations under the ACDBE Regulations until such time as the lawsuit was resolved.

107.

Cordial found Holdings' lawsuit to be frivolous and further retaliatory action by Holdings against Cordial.  Cordial filed a motion to dismiss the lawsuit in its entirety.

108.

In response to Cordial's motion to dismiss, Holdings filed a first amended complaint ("FAC").  The FAC added XpresSpa Atlanta as a party plaintiff and dropped Goswami, who had been a passive investor in XpresSpa Atlanta, as a party defendant.  The FAC otherwise continued many of the same misleading and dishonest features of the original complaint.  Cordial moved to dismiss the FAC in its entirety.

109.

Seeing no action from the City to obey the directives given to it months earlier by the FAA's Office of Civil Rights, Cordial in February 2017 filed a new complaint against the City for its continuing noncompliance with the ACDBE Regulations, pursuant to the provisions of *14 C.F.R., Part 16.*  The Part 16 complaint is directed at a different office within the FAA with more definitive enforcement authority.  One of the potential sanctions under the Part 16 proceedings for the City's continued noncompliance with the ACDBE Regulations is a reduction in the federal grant funding of the Airport.  The City moved to dismiss the Part 16 complaint, reiterating its position that the FAA's administrative proceedings should be terminated or stayed until the lawsuit between Holdings and Cordial and its members had concluded.

110.

The FAA denied the City's motion to dismiss the Part 16 proceeding and required the City to answer Cordial's Part 16 complaint.  (***Exhibit 26***).

111.

In September 2017, New York Supreme Court Judge Edward Ramos conducted a hearing on Cordial's motion to dismiss the FAC.  (***Exhibit 27***).  In the hearing, he asked Holdings' lawyer how Holdings had been damaged in light of the fact that Cordial has always been ACDBE certified.  Holdings' lawyer could not answer this question and when asked why Holdings had not commenced legal action against the City, given that the City had not allowed the build out of the D, E, and F stores.  Holdings' lawyer referenced the ongoing collusion between the City and Holdings by stating ***"Because we worked out these issues".***  Judge Ramos responded ***"That's nice.  You don't want to sue them [the City] because of a political issue but you will sue this company [Cordial]."***

112.

In November 2017, Judge Ramos entered an order dismissing the FAC in its entirety.  This ruling confirmed Cordial's position that the FAC was frivolous and without merit, legally or factually.  (***Exhibit 28***).

113.

With Judge Ramos's ruling, a pattern was further established in this case, in that every independent, neutral body which has been called upon to review issues pertaining to the Cordial/ Holdings dispute has ruled in Cordial's favor, including the FAA's Office of Civil Rights (on three separate occasions), USDOT, GDOT, and the New York Supreme Court.  The only party that has consistently ruled against Cordial and in favor of Holdings has been the City, the federal government's Sponsor of the ACDBE program at Hartfield.  The City's rulings remain invalid due to its manifest bias, antagonism, hostility, and discrimination against Cordial, and its participation in a conspiracy with Holdings and other Defendants to injure Cordial.

114.

The conspiracy and collusion between the Defendants has continued unabated since at least the summer of 2014.   Even though Cordial's membership/ownership interest in XpresSpa Atlanta has never been legally terminated in accordance with the provisions of *49 C.F.R. § 26.53(f)*, Holdings has continuously illegally and improperly diverted Cordial's share of the profits and management fees from Cordial to Azure and MMC.  Holdings, with the City's active complicity, has blocked Cordial from its participation in the business of

XpresSpa Atlanta.   In complete violation of the XpresSpa Atlanta Operating Agreement, Holdings has zeroed out and converted Cordial's $450,000 investment to Holdings benefit and control.   In substance, Holdings has purported to take Cordial's capital account and to improperly award it to Cordial's minority interest holder and MMC.  The City's collusion was on further conspicuous display in that when it rendered its order in April 2016 approving Holdings termination request, the City failed to address the issue of Cordial's capital account, thus, in effect, sanctioning the conversion and theft of Cordial's capital account.   This also reinforces the City's abject failure to ever review the joint venture's agreements for compliance with the ACDBE Regulations.

115.

The City, acting through its policy makers, including former Mayor Mohammed K. Reed, Deputy Chief of Staff Katrina Taylor, Airport General Manager Roosevelt Council, OCC Director Larry Scott, former City Attorney Cathy Hampton, Assistant City Attorney Martin Clarke, and outside Attorney William K. Whitner, have all colluded with Holdings, Wilson, Azure, Hutchinson, MMC, Jones, MD-Jones, and Parks, Jr. to deny Cordial its rights to participate in the ACDBE program.  The City has taken frivolous legal positions, has stubbornly refused to come into compliance with the ACDBE Regulations, has arrogantly

defied the FAA Office of Civil Rights, all with the intent to destroy Cordial's membership/ownership interest in XpresSpa Atlanta and its right to participate in the ACDBE program.

116.

In summary, this is a case about private agendas, being pursued at the expense of and in complete disregard to the public policy embodied in the federal ACDBE Regulations.  It reflects a deviation from appropriate governance and management of the ACDBE program by its Sponsor and policy makers in order to create unearned benefits for people close to the Mayor to the detriment and destruction of a small ACDBE firm.  In the case of Holdings, it was the private agenda of stifling and suppressing real and substantive participation by a socially and economically disadvantaged firm, who at the time committed what Holdings viewed as an original sin, i.e., seeking out, as was its right to do, the advice, guidance, and oversight of the Program's Sponsor regarding ACDBE joint venture concerns.  In the case of Parks, Jr., Wilson,  and Jones, it was the private agenda of greed and the effort to take advantage of the racially discriminatory attitudes of Holdings' founders to appropriate the corporate opportunity in which Cordial had invested $450,000 for their own personal self-gain, in complete dereliction of the duties of loyalty and good faith owed to Cordial by Wilson and Jones and the duty

66

to not interfere on the part of Parks, Jr., (as to his wife who had been allowed to withdraw from Cordial under that condition).    In the case of Hutchinson and MMC, it was the private agenda of opportunism, having been selected gratuitously by somebody to be placed in a deal where Cordial was already under a binding contractual relationship.  In the case of Reed, it was the private agenda of the abuse and misuse of his power and authority as Mayor to benefit his friends along with his warped attitude that once he had decided that Holdings and his childhood friend Parks, Jr. were to be his handpicked winner in the XpresSpa/Cordial dispute, notwithstanding the legal and factual merits in favor of  Cordial,  that he would do whatever it took, at all costs, to destroy Cordial's business interests, including paying the law firm of another close friend, Whitner, over $1 million Atlanta taxpayer dollars just to be told by the FAA over and over again that the City was noncompliant with the ACDBE Regulations.  This matter has been less of business or legal dispute, but instead has been more in the nature of a personal vendetta against Cordial and Edwards, in pursuit of these unsavory private agendas, first by Holdings and later sanctioned by Reed.  Holdings and the City's conduct in this matter brings to mind the movie character the Terminator, in that no matter how many times their untoward actions have been defeated and rejected by GDOT, USDOT, the FAA (on three separate occasions), and the New York State Court,

they keep coming forward with the same stale and rejected arguments intertwined with their malicious intent to injure and destroy Cordial and Edwards.  Cordial and Edwards have been significantly damaged by the wrongful actions of the City, Reed, the City's policy makers, Holdings, Wilson, Azure, Hutchinson, MMC, Jones, MD-Jones, and Parks, Jr.

### 117.

At some unspecified point in time, the City granted Defendants XpresSpa Atlanta and Holding the clearance to move forward with the construction and opening of the D Store under the D, E and F store lease.  In doing so, the City and Defendants XpresSpa Atlanta and Holdings have continued to act in disregard of Cordial rights to participate in the ACDBE program as a member of XpresSpa Atlanta.

### 118.

On or about August 2018, the D store has opened to the traveling public.  On information and belief, XpresSpa Atlanta and Holdings have begun or will begin in the near future the diversion of net profits and management fee income due to Cordial as a member of XpresSpa Atlanta.

## COUNT ONE

## *SECTION 1983* FOURTEENTH AMENDMENT PROCEDURAL DUE PROCESS CLAIM AS TO DEFENDANTS CITY AND REED

### 119.

The allegations of paragraphs 1 through 118 of this complaint are hereby incorporated by reference and realleged as if each such allegation were fully set forth in this Count.

### 120.

The City conducted two administrative hearings in February 2016, involving matters pertaining to Cordial and Holdings.

### 121.

Cordial had Fourteenth Amendment procedural due process rights in these administrative hearings.

### 122.

Cordial was entitled, as a matter of law, to a neutral and impartial arbiter in both of these administrative hearings.

### 123.

The City was not a neutral and impartial arbiter in either administrative hearing, in that beginning at some point in time in 2014, the City, at the direction

of Reed, entered into a conspiracy with Holdings, Azure, Wilson, MMC, Hutchinson, Jones, Parks, Jr., and others to deprive Cordial of its rights under the ACDBE Regulations.

### 124.

The City was not a neutral or impartial arbiter in the two administrative hearings that it conducted, in that the City, beginning at some point in time in 2014 and continuing through the dates of the hearings until the present time, had developed a bias, antagonism and hostility toward Cordial, which bias, antagonism and hostility was conspicuously manifested within the CAP plan as reflected in the City's disparaging comments throughout such document (as referenced in paragraphs 89-90 above).

### 125.

The City was not a neutral or impartial arbiter in that it had entered into an agreement with Holdings whereby the City agreed in the summer of 2015, at the direction of Reed, to allow Holdings to terminate Cordial's ACDBE interest in XpresSpa Atlanta in exchange for the City rescinding its termination for convenience, an agreement which the City did not disclose to Cordial.

126.

The City was not a neutral or impartial arbiter in that it negotiated with and accepted from Holdings something of value, an indemnification clause, such that XpresSpa agreed to indemnify the City in the event that Cordial commenced litigation against the City to challenge its termination from XpresSpa Atlanta.

127.

Upon learning about the City's bias, antagonism and hostility towards it and prior to the hearings, Cordial demanded that the City recuse itself from the administrative hearings it conducted in February 2016.

128.

Prior to these administrative hearings, Cordial brought to the FAA's attention the facts about the City's bias, antagonism and hostility towards Cordial and the agreements that the City had reached with Holdings on issues in dispute between Cordial and Holdings. The FAA agreed that these facts demonstrated that the City was not a neutral or impartial arbiter, in that the FAA also requested that the City recuse itself from the hearings.

129.

The City refused and rejected all of Cordial's requests and the request of the FAA to recuse itself from the administrative hearings.

130.

Cordial renewed its request for the City to recuse itself at the beginning of each hearing, and Cordial stated its objection for the official record. The City denied each such request.

131.

Notwithstanding its obvious and blatant bias against Cordial, the City proceeded to act as an arbiter in these administrative hearings and rendered decisions completely favorable to Holdings and completely adverse to Cordial.  In October 2016, the FAA rejected the City's rulings in both hearings and directed the City to *"retract"* its written rulings from both administrative hearings and to have the hearings conducted before an *"independent third party arbiter".*

132.

The City refused to comply with the FAA's directives set forth above.  The City's insistence upon acting as a biased and partial arbiter in the administrative hearings was at the direction of Reed.  In response to the FAA's October 2016

letter, the City, without further investigation, amended its February 2016 ruling on Cordial's retaliation complaint by finding against Cordial on every one of its claims and submitting its new findings to the FAA.

### 133.

The City and Reed have violated Cordial's Fourteenth Amendment procedural due process rights.   Given that the FAA directed the City to have such hearings conducted by an independent third party, and the City has refused, the City's violation of Cordial's Fourteenth Amendment procedural due process rights is continuing and ongoing, and Cordial is entitled to appropriate relief.

## COUNT TWO
## *SECTION 1983* FIFTH AND FOURTEENTH SUBSTANTIVE DUE PROCESS CLAIM AS TO DEFENDANTS CITY AND REED

### 134.

The allegations of paragraphs 1 through 118 of this complaint are hereby incorporated by reference and realleged as if each such allegation were fully set forth in this Count.

### 135.

The ACDBE Regulations, specifically *49 C.F.R. § 26.53(f)* which was adopted in January 2011, prohibit the termination of an ACDBE firm without a

prior written finding of good cause by the recipient of federal airport funds, in this case the City.

136.

*49 C.F.R. § 26.53(f)* specifies and defines the grounds of good cause.

137.

The City, acting at the direction of Reed, completely disregarded the requirements of *49 C.F.R. § 26.53(f)*, and its obligations thereunder, by allowing Holdings in July 2014 and October 2014 to *de facto* terminate Cordial's ACDBE interest in XpresSpa Atlanta without either the City or Holdings complying with the provisions of *49 C.F.R. § 26.53(f).*

138.

The ACDBE Regulations prohibit prime concessionaires from terminating ACDBE firms without good cause and for the convenience of the prime concessionaire.

139.

Holdings asserted it had grounds for terminating Cordial due to Holdings' unilateral declaration that the parties' joint venture relationship in XpresSpa Atlanta was "irretrievably broken". Both the City and Holdings knew that an

"irretrievably broken" standard was not a valid ground under *49 C.F.R. § 26.53(f)* for the termination of Cordial's contract and was, in effect, a prohibited termination for Holdings' convenience.

140.

The City, acting at the direction of Reed, and through several of its policymakers with final decision making authority as to specific functional areas of City government, including Airport General Manager Roosevelt Council, OCC Director Larry Scott, City Attorney Cathy Hampton, and outside Attorney Whitner, adopted the irretrievably broken standard to authorize Cordial's termination, which, in effect, was the adoption of the termination for convenience standard prohibited by the ACDBE Regulations.

141.

There did not exist and has never existed good cause under *49 C.F.R. § 26.53(f)* for the termination of Cordial's interest in XpresSpa Atlanta.

142.

The City purposefully and intentionally violated Cordial's rights under the ACDBE Regulations.  In so doing, the City acted in an arbitrary and capricious manner, thereby violating Cordial's Fifth and Fourteenth Amendment substantive due process rights.

143.

The City's violation of Cordial's Fifth and Fourteenth Amendment substantive due process rights have caused Cordial significant financial harm and damage in an amount to be shown at trial.

**COUNT THREE**

*SECTION 1983* **FOURTEENTH AMENDMENT EQUAL PROTECTION CLAIM**
**AS TO DEFENDANTS CITY AND REED**

144.

The allegations of paragraphs 1 through 118 of this complaint are hereby incorporated by reference and realleged as if each such allegation were fully set forth in this Count.

145.

As a recipient of federal funds for the Airport, the City has agreed to implement the ACDBE program and to comply with the ACDBE Regulations.

146.

Under the ACDBE Regulations, certification decisions are delegated to various agencies by USDOT.   In Georgia, these certifying agencies are GDOT and the Metropolitan Atlanta Rapid Transit Authority ("MARTA").

147.

The City does not presently have and has never had at the times relevant to this complaint any authority to certify or decertify ACDBE firms.

148.

In 2012, the FAA publicly raised serious questions regarding the continuing ACDBE certification status of certain ACDBE firms, who were members of joint ventures or subcontractors on awarded concessions contracts at the Airport.  The FAA directed the decertification of these firms.

149.

The City responded to the FAA by noting that it was the responsibility of GDOT and MARTA to make certification decisions and so long as the firms were ACDBE certified by one of these certifying agencies, the City would not take any actions against these ACDBE firms' joint venture or subcontract interests.

150.

By contrast, due to the City's joinder in a conspiracy to violate Cordial's rights under the ACDBE program, and due to the City's bias, antagonism, and hostility towards Cordial, the City treated Cordial differently than the City had

previously treated these other ACDBE firms.  This disparate treatment was at the direction of Reed.

151.

Despite the unambiguous mandate of *49 C.F.R. § 26.83(h)* that once certified, an ACDBE firm remains certified unless and until decertified, the City allowed Holdings to terminate Cordial based on Holdings' meritless challenge to Cordial's certification status.

152.

The City and Reed's treatment of Cordial was different than the City and Reed's treatment of other ACDBE firms that had been in similarly situated circumstances and therefore, the City and Reed violated Cordial's Fourteenth Amendment right to equal protection under the law.

**COUNT FOUR**

***SECTION 1985* CONSPIRACY TO VIOLATE CORDIAL AND EDWARDS'
CIVIL AND FEDERAL RIGHTS AS TO DEFENDANTS CITY, REED,
HOLDINGS, AZURE, HUTCHINSON, MMC, MD-JONES, AND PARKS,
JR.**

### 153.

The allegations of paragraphs 1 through 118 of this complaint are hereby
incorporated by reference and realleged as if each such allegation were fully set
forth in this Count.

### 154.

XpresSpa's founders, Moreton and Marisol Binn, held racially
discriminatory attitudes and views regarding the federal ACDBE program. Mr.
Binn frequently referred to the program as "bullshit" and complained that the
ACDBE program required B&P to "give away" part of its business to minorities.
Mr. Binn also frequently made disparaging comments about his ACDBE partners.

### 155.

As a result of these racially discriminatory attitudes, Holdings followed
certain practices in its joint venture relationship with Cordial, designed to ensure
that Cordial had no real authority over any aspect of the XpresSpa Atlanta joint

venture.   Cordial was unaware of the Binns' discriminatory attitudes prior to joining the joint venture.

156.

Though required to do so by the ACDBE Regulations, Holdings did not permit Cordial to (i) participate in the budgeting process for the joint venture store; (ii) exercise any authority over any part of the store budget, i.e., Cordial could not spend a single dollar on behalf of the joint venture; and (iii) exercise any authority with respect to store vendors, i.e., Cordial could not order a single supply for the store.   These practices, *inter alia*, caused XpresSpa Atlanta to be noncompliant with the ACDBE Regulations, notwithstanding Cordial's diligent work in the operations of the A store.

157.

Mrs. Binn frequently complained about Edwards being physically present in the store, even though the ACDBE Regulations and the XpresSpa Atlanta Operating Agreement, required and contemplated active participation by the ACDBE in the operations of the joint venture business.

158.

On information and belief, Holdings prefers its ACDBE partners to be passive, not seek to exercise any authority over joint venture affairs, and to allow Holdings to exercise all such authority in violation of the ACDBE Regulations.

159.

Cordial consistently tried to get XpresSpa Atlanta to be compliant with the ACDBE Regulations and when it could not, it sought out the assistance of the sponsor of the program in December 2013.  When Cordial informed Holdings that Cordial had sought the intercession of the Airport's management to help address Cordial's issues with Holdings, including the proper delineation of ACDBE roles and responsibilities, Holdings, and its founders Mr. and Mrs. Binn, concluded, consistent with their racially discriminatory attitudes, that Cordial had gotten out of line.  From that moment in time, Holdings adopted a single unrelenting goal, which was to retaliate against and punish Cordial by arbitrarily terminating its ACDBE interest in XpresSpa Atlanta.

160.

Holdings improperly hired City Councilman Aaron Watson as its attorney in December 2013, while he was still a member of the Atlanta City Council and while he still had governance and oversight authority over the Airport and its employees.

Holdings informed Cordial in January 2014 that it had hired Watson. By the time Holdings informed Cordial of this hiring, Watson was no longer in office, but subject to a one year cooling off period before he could conduct any business before the City. Both Holdings and Watson ignored the City's code of ethics. Cordial reported the violations to the Airport General Manager and OCC Director, yet neither office did anything to address this ethics problem.

161.

Holdings, the Binns, Watson, and Watson's law partner, former City Attorney Michael Coleman, commenced a conspiracy in early 2014 to terminate Cordial's ACDBE interest in XpresSpa Atlanta and in so doing to violate Cordial's federally protected rights to participate in the ACDBE program and to confer with the Airport management. Watson lobbied the Airport General Manager and senior staff in favor of Holdings.

162.

Coleman and Watson launched a campaign to discredit Cordial with GDOT, USDOT, and officials from the City and Airport in an attempt to mislead them about Cordial's certification. Without any official documentation from GDOT, the certifying agency, Holdings' lawyers led an unyielding effort to convince officials

that (i) Cordial was violating the ACDBE program; (ii) that Cordial was not certified as an ACDBE; and (iii) that Cordial was "masquerading as an ACDBE".

163.

Coleman recruited Parks, Jr. to the conspiracy. A central aspect of the conspiracy was to mask Holdings and the Binns' racially discriminatory intent, practices and animus towards Cordial. Coleman and Parks, Jr. accomplished this part of the conspiracy by recruiting Cordial's minority interest holders Wilson and Jones to betray Cordial and to breach their fiduciary duties to Cordial. By recruiting these minority interest holders, Holdings could project a false public image that it was working well with racially diverse individuals, especially Wilson.

164.

Parks, Jr. joined the conspiracy because he holds a secret ownership interest in either Wilson's ownership in Cordial or in Azure. Parks, Jr., was motivated by self-gain, and the prospect of ending up with ownership of the ACDBE interest in the XpresSpa Atlanta joint venture.

165.

Wilson (and her company Azure), like Parks, Jr., joined the conspiracy for purposes of self-gain, i.e., to increase her percentage ownership in the joint venture

and to eventually replace Cordial altogether.  Holdings rewarded Wilson's joining the conspiracy by providing her with gifts, meals, travel and other things of value, including Cordial's business interest.

166.

Jones (and her company MD-Jones) joined the conspiracy because she thought it would facilitate her efforts to gain control of the ACDBE interest in the joint venture, either through the creation of MD-Jones or by blocking and obstructing Cordial's efforts to have GDOT update its ACDBE Registry.

167.

Hutchinson (and her company MMC) eventually joined the conspiracy at some point in time in 2015 so that she could appropriate Cordial's business interest in XpresSpa Atlanta.

168.

Reed joined the conspiracy because Parks, Jr. is his close personal friend since childhood and throughout Reed's administration, Reed made numerous decisions to require Parks, Jr's placement, directly or indirectly, in various deals involving City business.

84

169.

Parks, Jr. coached Holdings on how to proceed, while providing assurances that the City would not interfere with any action they chose to take against Cordial. Various other City officials joined the conspiracy at the direction of Reed, so as to keep their jobs and to avoid incurring Reed's wrath.   These officials included Airport General Manager Roosevelt Council, City Attorney Kathy Hampton, Deputy Chief of Staff Katrina Taylor, OCC Director Larry Scott, and outside attorney William K. Whitner.  Parks, Jr. often boasted about his relationships and influence with City officials, including Reed being his boyhood friend and Taylor being the Godmother of his children.

170.

As a result of this conspiracy, the City has conspicuously and brazenly violated Cordial and Edwards' rights under the ACDBE Regulations, such that the FAA Office of Civil Rights, on three separate occasions, found that the City was noncompliant with the ACDBE Regulations.

171.

Cordial has been damaged by this conspiracy to violate its civil and federal rights in an amount to be proven at trial.

## COUNT FIVE

## *SECTION 1986* CLAIM FOR ALLOWING CORDIAL'S CIVIL AND FEDERAL RIGHTS TO BE VIOLATED AS TO DEFENDANTS CITY AND REED

172.

The allegations of paragraphs 1 through 118 of this complaint are hereby incorporated by reference and realleged as if each such allegation were fully set forth in this Count.

173.

Holdings has violated Cordial's civil and federal rights under the ACDBE Regulations by engaging in prohibited retaliation against Cordial for Cordial exercising its rights to confer with the City regarding its ACDBE issues with Holdings.

174.

Holdings violated Cordial's civil and federal rights in July 2014 by Holdings' *de facto* termination of Cordial's rights under the ACDBE Regulations without complying with the provisions of *49 C.F.R. § 26.53(f)*, which required Holdings to seek and obtain from the City a prior written finding of good cause for Cordial's termination.

175.

Holdings violated Cordial's civil and federal rights in October 2014 by Holdings' *de facto* termination of Cordial's rights under the ACDBE Regulations without complying with the provisions of ***49 C.F.R. § 26.53(f),*** which required Holdings to seek and obtain from the City a prior written finding of good cause for Cordial's termination.

176.

The City's purported written finding of good cause for Cordial's termination in April 2016 is invalid and of no legal effect due to the City's violations of Cordial's Fourteenth Amendment Procedural Due Process rights.

177.

The City's purported written finding of good cause for Cordial's termination in April 2016 is invalid and of no legal effect because of the FAA's rejection of the City's findings, pursuant to the FAA's express and inherent regulatory authority over the City and its federal ACDBE program.  Further, the FAA in October and November 2016 directed the City to throw out its findings and to have a new hearing conducted by an independent party within 90 days.  To this date, the City has refused to follow these directives.

178.

As a sponsor of the ACDBE Program, the City and Reed had the power and authority to prevent, or aid in preventing, the wrongs done to Cordial by Holdings.

179.

The City and Reed had the power and authority to prevent, or aid in preventing, the wrongs done to Cordial, pursuant to the conspiracy articulated in Count Four above.

180.

The City and Reed neglected and refused to prevent, or aid in preventing, the wrongs done to Cordial by Holdings in violation of Cordial's civil and federal rights and pursuant to the conspiracy set forth in Count Four above.

181.

The City and Reed are liable to Cordial for their neglect and refusal to prevent, or aid in preventing, the wrongs done to Cordial by Holdings in violation of Cordial's civil and federal rights and pursuant to the conspiracy set forth in Count Four above.

## COUNT SIX

## *SECTION 1988* CLAIM FOR ATTORNEYS FEES AS TO DEFENDANTS CITY, REED, HOLDINGS, AZURE, HUTCHINSON, MMC, MD-JONES, AND PARKS, JR.

182.

The allegations of paragraphs 1 through 118 of this complaint are hereby incorporated by reference and realleged as if each such allegation were fully set forth in this Count.

183.

The City and Reed have violated Cordial's Fourteenth Amendment Procedural Due Process rights, Cordial's Fifth and Fourteenth Amendment Substantive Due Process rights, and Cordial's Fourteenth Amendment Equal Protection rights, as set forth in Count One, Two and Three of this Complaint, and are subject under *42 U.S.C. § 1983* to appropriate remedies and civil liability.

184.

Under *42 U.S.C. § 1985*, the City, Reed, Holdings, Azure, MMC, Hutchinson, MD-Jones, and Parks, Jr. are liable to Cordial for their conspiracy to violate Cordial's civil and federal rights.

185.

Under *42 U.S.C. § 1986*, the City and Reed are liable to Cordial for their neglect and refusal to prevent, or aid in preventing, the violation of Cordial's civil and federal rights, when the City and Reed had the power and authority to prevent, or aid in preventing, such violations.

186.

Based upon Cordial's entitlement to relief under *42 U.S.C. §§ 1983, 1985 and 1986,* the City, Reed, Holdings, Azure, Hutchinson, MMC, MD-Jones, and Parks, Jr. are liable to Cordial for attorney's fees pursuant to *42 U.S.C. § 1988*.

## **COUNT SEVEN**

## **FEDERAL PUNITIVE DAMAGES AS TO DEFENDANTS REED, HOLDINGS, AZURE, MMC, HUTCHINSON, MD-JONES, AND PARKS, JR.**

187.

The allegations of paragraphs 1 through 118 of this complaint are hereby incorporated by reference and realleged as if each such allegation were fully set forth in this Count.

188.

Defendants Reed, Holdings, Azure, MMC, Hutchinson, MD-Jones, and Parks, Jr.'s conduct towards Cordial was malicious, oppressive and in reckless disregard of Cordial and Edwards' rights and interests.

189.

Defendants Reed, Holdings, Azure, MMC, Hutchinson, MD-Jones, and Parks, Jr.'s conduct was accompanied by ill will, spite and the express intention of injuring Cordial and destroying Cordial's business interests and injuring and destroying Edwards.

190.

Defendants Reed, Holdings, Azure, MMC, Hutchinson, MD-Jones, and Parks, Jr.'s conduct was with complete indifference to Cordial and Edwards' rights.

191.

Defendants Reed, Holdings, Azure, MMC, Hutchinson, MD-Jones, and Parks, Jr.'s conduct was unnecessarily harsh and severe, and as to Defendant Reed, reflected the misuse and abuse of his office, power and authority to benefit his friends.

192.

Defendants Reed, Holdings, Azure, MMC, Hutchinson, MD-Jones, and Parks, Jr. are liable to Cordial and Edwards for punitive damages under federal law in an amount to be determined by the enlightened conscience of the jury, which amount Cordial and Edwards assert should be in excess of $7,500,000.

## COUNT EIGHT

## DECLARATORY JUDGMENT AS TO DEFENDANT HOLDINGS REGARDING ITS STATUS IN XPRESSPA ATLANTA

193.

The allegations of paragraphs 1 through 118 of this complaint are hereby incorporated by reference and realleged as if each such allegation were fully set forth in this Count.

194.

As of December 1, 2011, B&P and Cordial (under its former name Montclair) entered into the XpresSpa Atlanta Operating Agreement.

195.

*Section 10.1* of the XpresSpa Atlanta Operating Agreement required the written consent of XpresSpa Atlanta's Corporate Management Committee for a member to assign its economic membership interest in XpresSpa Atlanta.

196.

***Section 10.4*** provided that no transferee of the economic membership interest became a member of XpresSpa Atlanta unless such transferee became a signatory to the XpresSpa Atlanta Operating Agreement, thereby agreeing to all of the terms and conditions of such agreement.

197.

In January 2012, B&P transferred and assigned its interest in XpresSpa Atlanta to Holdings.

198.

Holdings never became a signatory to the XpresSpa Atlanta Operating Agreement as required to become a member of XpresSpa Atlanta.

199.

Because Holdings never became a signatory to the XpresSpa Atlanta Operating Agreement, it never became a member of XpresSpa Atlanta.

198.

As a nonmember of XpresSpa Atlanta, Holdings has only an economic interest in XpresSpa Atlanta, but no governance rights in the company. Accordingly, since January 2012, Cordial has been the only member of XpresSpa

Atlanta and has been solely possessed, as a matter of law, of the governance rights in the XpresSpa Atlanta joint venture.

200.

**Section 13.4** of the XpresSpa Atlanta Operating Agreement provided, in pertinent part, that the agreement could only be amended in a written document signed by both B&P and Cordial and that such amendment was required to specify the section of the agreement being amended.  The XpresSpa Atlanta Operating Agreement was never amended by B&P and Cordial.

201.

**Section 13.4** of the XpresSpa Atlanta Operating Agreement further provided that no course of performance or other conduct pursued or acquiesced in, nor any usage of trade, would amend the agreement or affect the parties' rights and remedies under the agreement.

202.

Judge Ramos, in his order dismissing the FAC, ruled that Holdings did not have standing to bring the claims it asserted against Cordial because it had never become a member of the XpresSpa Atlanta Operating Agreement.

203.

Cordial seeks a declaration, pursuant to **O.C.G.A. § 9-4-1 et seq** that Holdings is not and has never been a member of XpresSpa Atlanta, and that Holdings does not have and has never had the legal authority to take any action on behalf of XpresSpa Atlanta or to cause XpresSpa Atlanta to take any action, including termination of Cordial's membership interest in XpresSpa Atlanta or substituting Azure and MMC for Cordial as the ACDBE member of XpresSpa Atlanta.

## COUNT NINE

## DECLARATORY JUDGMENT THAT CORDIAL REMAINS A MEMBER OF XPRESSPA ATLANTA AS TO DEFENDANTS HOLDINGS AND XPRESSPA ATLANTA

205.

The allegations of paragraphs 1 through 118 of this complaint are hereby incorporated by reference and realleged as if each such allegation were fully set forth in this Count.

206.

XpresSpa Atlanta is a party to two leases with the City, and in those leases, XpresSpa Atlanta agreed to observe and comply with the ACDBE Regulations.

207.

*49 C.F.R. § 26.53(f)* is a governing ACDBE Regulation.  It provides that a prime concessionaire may not terminate its ACDBE venturer from a joint venture without seeking and obtaining a prior written finding of good cause from the recipient of federal airport funds.

208.

*49 C.F.R. § 26.53(f)* imposes a regulatory condition precedent which must be complied with prior to a legally effective termination of an ACDBE firm from a joint venture.

209.

As of July 2014, when Holdings first purported to terminate Cordial's interest in XpresSpa Atlanta, Holdings had not sought nor obtained, and accordingly the City had not provided, a prior written finding of good cause for Cordial's termination as a member/owner of XpresSpa Atlanta.

210.

As of October 2014, when Holdings next purported to terminate Cordial's interest in XpresSpa Atlanta, Holdings had not sought nor obtained, and

accordingly the City had not provided a prior written finding of good cause for Cordial's termination as a member/owner of XpresSpa Atlanta.

211.

From July 2014 until April 2016, there was no prior written finding of good cause by the City authorizing Cordial's termination as an ACDBE member of XpresSpa Atlanta.

212.

In April 2016, the City purported to make a written finding of good cause for Cordial's termination, but such written finding was invalid due to the City's violations of Cordial's procedural due process rights.

213.

Moreover, the FAA has express regulatory oversight over the good cause determinations of its federal fund recipients under *49 C.F.R. § 26.53(f)*.   In October 2016, the FAA overrule and rejected the City's good cause findings and directed the City to *"Retract the Order on Substitution and engage an independent third party within 30 days of receipt of this letter.  The third party will hear the termination/substitution and issue a final report and binding*

***determination within 180 days of the date of this letter."*** The FAA reaffirmed this directive to the City in November 2016.

214.

Moreover, because Holdings never became a signatory to the XpresSpa Atlanta Operating Agreement and has never become a member of XpresSpa Atlanta with governance rights, Holdings never possessed the legal authority to terminate Cordial's membership interest in XpresSpa Atlanta in either July 2014 or October 2014. This is a point which the City should have known, if it had conducted the review of the joint venture agreements as it was directed to do by the FAA in December 2015.

215.

Cordial seeks a declaration pursuant to ***O.C.G.A. § 9-4-1 et seq.*** that it is and has been a member of XpresSpa Atlanta continuously since December 1, 2011 and that Cordial has been the sole member of XpresSpa Atlanta with governance authority since January 2012.

## COUNT TEN

## DECLARATORY JUDGMENT THAT HOLDINGS HAD NO RIGHT OF SETOFF AGAINST CORDIAL'S PROFIT DISTRIBUTIONS AND MANAGEMENT FEES SINCE 2014 AS TO DEFENDANT HOLDINGS

### 216.

The allegations of paragraphs 1 through 118 of this complaint are hereby incorporated by reference and realleged as if each such allegation were fully set forth in this Count.

### 217.

As a member of XpresSpa Atlanta, Cordial was entitled to a distribution of 36% of XpresSpa Atlanta's net cash flow, as such term is defined in **Section 1.1(cc)** of the XpresSpa Atlanta Operating Agreement.

### 218.

In April 2015, Holdings sent Cordial a federal form K-1 in excess of $150,000, which supposedly represented Cordial's distribution of income from XpresSpa Atlanta for the tax year 2014.

### 219.

Holdings intentionally refused to remit to Cordial the funds reflected on Cordial's K-1 statement for year ending 2014.

220.

Cordial made demand on Holdings for the disbursement of these funds, but Holdings has steadfastly refused to remit these funds.

221.

Due to Holdings' issuing Cordial's 2014 K-1 without the disbursement of the funds reflected on such form and reported to the Internal Revenue Service, Cordial members were forced to recognize taxable income for 2014 on income that Cordial did not receive.

222.

Cordial brought this matter to the attention of the City, but the City refused to provide any assistance to Cordial or to take any action against Holdings.

223.

Holdings' action in issuing Cordial's 2014 K-1 without remitting the funds was financial retaliation against Cordial for exercising its rights under the ACDBE Regulations.

224.

At the February 2016 hearing on Cordial's claims of retaliation against Holdings, Holdings sought to defend its unjustified action described above by asserting that Cordial had received "phantom income" due to Holdings setting off its alleged claims against Cordial's profit distribution. Holdings' position, in addition to being contrary to law, was not sanctioned under the XpresSpa Atlanta Operating Agreement.

225.

Cordial's share of net cash flow for the year 2014 was a liquidated sum, contractually calculated and due under the XpresSpa Atlanta Operating Agreement.

226.

Holdings' alleged claims were unliquidated and speculative.

227.

Holdings had no right to set off its speculative, unliquidated claims against Cordial's liquidated, contractually based right to receive its net cash flow distribution.

228.

Holdings subsequently asserted frivolous claims against Cordial in the lawsuit it filed in state court in New York in January 2017.  In November 2017, the judge dismissed Holdings' claims in their entirety against Cordial.

229.

Cordial has not received its net cash flow distributions for the tax years of 2014, 2015, 2016, and 2017, even though it remains a member of XpresSpa Atlanta.

230.

Cordial seeks a declaration pursuant to *O.C.G.A. § 9-4-1 et seq.* that Holdings had no right to set off any of its speculative, unliquidated claims against Cordial profit distributions for 2014, 2015, 2016, and 2017.

## COUNT ELEVEN

## TORTIOUS INTERFERENCE WITH CORDIAL'S OPERATING AGREEMENT
## BY THE DEFENDANT REED, HOLDINGS, AZURE, MMC, HUTCHINSON, MD-JONES AND PARKS, JR.

### 231.

The allegations of paragraphs 1 through 118 of this complaint are hereby incorporated by reference and realleged as if each such allegation were fully set forth in this Count.

### 232.

The Cordial Operating Agreement is a valid, enforceable agreement among its members, which includes Edwards.

### 233.

Edwards has protectable interests in the Cordial Operating Agreement.

### 234.

Reed, Holdings, Azure, MMC, Hutchinson, MD-Jones, and Parks, Jr. are strangers to the Cordial's Operating Agreement.

235.

After purporting to have terminated Cordial's membership and ownership interest, Holdings specifically identified to the City in an email that Parks, Jr. was its "business advisor".

236.

By entering into a conspiracy to injure Cordial and Edwards, as set forth in Counts Four and Sixteen of this Complaint, Reed, Holdings, Azure, MMC, Hutchinson, MD-Jones, and Parks, Jr. have tortiously interfered with Edwards' contractual rights and interests in the Cordial Operating Agreement.

237.

Reed, Holdings, Azure, MMC, Hutchinson, MD-Jones, and Parks, Jr. are liable to Edwards for the damage caused to her by their interference with her rights and interests in the Cordial Operating Agreement in an amount to be shown at trial.

## COUNT TWELVE

## TORTIOUS INTERFERENCE WITH XPRESSPA ATLANTA OPERATING AGREEMENT BY THE DEFENDANTS REED, AZURE, MMC, HUTCHINSON, MD-JONES, AND PARKS, JR.

### 238.

The allegations of paragraphs 1 through 118 of this complaint are hereby incorporated by reference and realleged as if each such allegation were fully set forth in this Count.

### 239.

The XpresSpa Atlanta Operating Agreement is a valid, enforceable agreement as to which Cordial is a party.

### 240.

Cordial has protectable interests in the XpresSpa Atlanta Operating Agreement.

### 241.

Reed, Azure, MMC, Hutchinson, MD-Jones, and Parks, Jr. are strangers to the XpresSpa Atlanta Operating Agreement.

242.

By entering into a conspiracy to injure Cordial, as set forth in Counts Four and Sixteen of this Complaint, Reed, Azure, MMC, Hutchinson, MD-Jones, and Parks, Jr. have tortiously interfered with Cordial's contractual rights and interests in the XpresSpa Atlanta Operating Agreement.

243.

Reed, Azure, MMC, Hutchinson, MD-Jones, and Parks, Jr. are liable to Cordial for the damage caused to it by their interference with its rights and interests in the XpresSpa Atlanta Operating Agreement in an amount to be shown at trial.

## COUNT THIRTEEN

## TORTIOUS INTERFERENCE WITH CORDIAL AND EDWARDS' BUSINESS RELATIONS AS TO DEFENDANTS REED, HOLDINGS, AZURE, MMC, HUTCHINSON MD-JONES, AND PARKS, JR.

244.

The allegations of paragraphs 1 through 118 of this complaint are hereby incorporated by reference and realleged as if each such allegation were fully set forth in this Count.

106

245.

As a small business and business owner doing business at the Airport and participating in the ACDBE program, Cordial and Edwards had reasonable expectancies of maintaining and growing its business and developing and building beneficial business relations relative to the airport concessions industry.

246.

Reed, Holdings, Azure, MMC, Hutchinson, MD-Jones, and Parks, Jr.'s actions in participating in a conspiracy to end Cordial's participation in the ACDBE program has prevented Cordial and Edwards from realizing their reasonable expectancies of maintaining and growing the business and of developing and building beneficial business relations in the airport concessions industry.

247.

Reed, Holdings, Azure, MMC, Hutchinson, MD-Jones, and Parks, Jr. are liable to Cordial and Edwards for their tortious interference with Cordial and Edwards' business relations in an amount to be proven at trial.

## COUNT FOURTEEN

## BREACH OF FIDUCIARY DUTY AS TO DEFENDANT HOLDINGS

248.

The allegations of paragraphs 1 through 118 of this complaint are hereby incorporated by reference and realleged as if each such allegation were fully set forth in this Count.

249.

As an economic interest holder in XpresSpa Atlanta since January 2012, Holdings had fiduciary duties owed to Cordial, a member of XpresSpa Atlanta.

250.

Holdings (i) by entering into the conspiracies set forth in Counts Four and Sixteen of this complaint with the intention of destroying Cordial's membership and ownership interests in XpresSpa Atlanta; (ii) by soliciting Cordial members Wilson and Jones to breach their fiduciary duties owed to Cordial and Cordial's other members; (iii) by tortiously interfering with Cordial's Operating Agreement; and (iv) by converting Cordial's net cash flow and management fee income, breached its fiduciary duties and obligations to Cordial.

251.

Holdings is liable to Cordial for Holdings' breaches of its fiduciary duties owed to Cordial, in an amount to be shown at trial.

## COUNT FIFTEEN
## BREACH OF FIDUCIARY DUTY AS TO DEFENDANT PARKS, JR.

252.

The allegations of paragraphs 1 through 118 of this complaint are hereby incorporated by reference and realleged as if each such allegation were fully set forth in this Count.

253.

Parks, Jr. has a disguised, hidden ownership interest in Cordial through either Azure or Wilson, or both.

254.

As an actual owner of Cordial, Parks, Jr. has fiduciary duties to Cordial and to the other Cordial members, including Edwards.

255.

Parks, Jr. (i) by entering into the conspiracies set forth in Counts Four and Sixteen of this complaint with the intention of destroying Cordial's membership and ownership interests in XpresSpa Atlanta and replacing Cordial as a member in

XpresSpa Atlanta with Azure and MMC; (ii) by soliciting Cordial members Wilson and Jones to breach their fiduciary duties owed to Cordial and Cordial's other members; (iii) by defrauding Cordial through retaining his secret ownership interest in Cordial despite begging for his wife to be allowed to withdraw from Cordial; and (iv) by tortiously interfering with Cordial's Operating Agreement, breached his fiduciary duties and obligations to Cordial and its other members, including Edwards.

256.

Parks, Jr. is liable to Cordial and Edwards for the breaches of his fiduciary duties owed to Cordial and Edwards, in an amount to be shown at trial.

**<u>COUNT SIXTEEN</u>**

**<u>STATE LAW CIVIL CONSPIRACY AGAINST DEFENDANTS REED, HOLDINGS, AZURE, MMC, HUTCHINSON, MD-JONES, AND PARKS, JR.</u>**

257.

The allegations of paragraphs 1 through 118 of this complaint are hereby incorporated by reference and realleged as if each such allegation were fully set forth in this Count.

258.

Defendants Reed, Holdings, Azure, MMC, Hutchinson, MD-Jones, and Parks, Jr. entered into a conspiracy to commit, procure and facilitate the commission of numerous torts against Cordial and its members, including Edwards.

259.

The torts committed, procured, and facilitated by Defendants Reed, Holdings, Azure, MMC, Hutchinson, MD-Jones, and Parks, Jr. against Cordial and its members, including Edwards, include (i) tortious interference with the Cordial Operating Agreement; (ii) tortious interference with the XpresSpa Atlanta Operating Agreement; (iii) breaches of fiduciary duties owed to Cordial and its members; (iv) fraud; and (v) conversion.

260.

The purpose of the Defendants' civil conspiracy was to destroy Cordial's membership and ownership interest in XpresSpa Atlanta in furtherance of (i) Holdings' malicious and retaliatory intent to end its joint venture relationship with Cordial; (ii) Azure, MMC, Hutchinson, MD-Jones, and Parks, Jr. intent to improperly and unlawfully appropriate Cordial's existing contractual and business opportunity in XpresSpa Atlanta; (iii) Reed's desire to direct yet another City

business related opportunity to his best friend, Parks, Jr.; and (iv) MD-Jones' intent to become recognized as the ACDBE firm in the XpresSpa Atlanta joint venture, through deceit and subterfuge.

261.

Defendants Reed, Holdings, Azure, MMC, Hutchinson, MD-Jones, and Parks, Jr.'s civil conspiracy was closely related to and aligned with these parties and the City's conspiracy to violate Cordial's civil and federal rights as detailed in Count Four above.

262.

Defendants Reed, Holdings, Azure, MMC, Hutchinson, MD-Jones, and Parks, Jr. are jointly and severally liable to Cordial and Edwards, pursuant to *O.C.G.A. § 51-12-30* in an amount to be proven at trial.

## COUNT SEVENTEEN
## BREACH OF CONTRACT AS TO DEFENDANT K. PARKS

263.

The allegations of paragraphs 1 through 118 of this complaint are hereby incorporated by reference and realleged as if each such allegation were fully set forth in this Count.

264.

K. Parks was a member of Cordial, following its reorganization in November 2011 from a one-member LLC to a five-member LLC.

265.

Beginning in January 2012, her husband Parks, Jr. began begging the other Cordial members to allow her to withdraw as a member of Cordial. Cordial members ultimately agreed to allow K. Parks to withdraw. Parks, Jr. also entreated the other Cordial members to allow Wilson to be substituted for K. Parks as a member of Cordial.

266.

Cordial agreed to allow Wilson to be substituted as a member in Cordial, on the condition that K. Parks agree in writing that neither she, nor anyone on her behalf, would interfere in Cordial matters in the future.

267.

K. Parks agreed in writing to these terms and conditions.

268.

K. Parks subsequently breached her agreement in that Parks, Jr. has actively interfered in Cordial's business affairs by entering into and being an active

participant in the conspiracies to violate Cordial's civil and federal rights and to commit tortious acts against Cordial and its other members.  Indeed, in an email communication to the City, XpresSpa founder Moreton Binn openly identified Parks, Jr. as Holdings' "business advisor" in Holdings' efforts to terminate Cordial's membership and ownership interests in XpresSpa Atlanta.

269.

Parks, Jr.'s actions were adverse to Cordial and were on K. Parks' behalf.

270.

K. Parks is liable to Cordial and Edwards for K. Parks' breach of contract in an amount to be proven at trial.

## COUNT EIGHTEEN
## FRAUD AS TO DEFENDANT PARKS, JR.

271.

The allegations of paragraphs 1 through 118 of this complaint are hereby incorporated by reference and realleged as if each such allegation were fully set forth in this Count.

272.

When Parks, Jr. begged Cordial and its other members to allow his wife, K. Parks, to withdraw and for Wilson to be substituted, Parks, Jr. represented to Cordial and its members that neither he nor K. Parks would have any ownership interest in Wilson's interest in XpresSpa Atlanta.

273.

On information and belief, this representation was false.

274.

On information and belief, Parks, Jr. has a secret ownership interest in Wilson's membership interest in Cordial, or in Azure, or both, which he has hidden from Cordial and its members, including Edwards.

275.

Parks, Jr.'s misrepresentation was material.  Had Parks, Jr. disclosed his hidden ownership interest in Wilson's membership interest in Cordial, Edwards would not have agreed to allow K. Parks to withdraw from Cordial or for Wilson to be substituted.

276.

On information and belief, Parks, Jr., a convicted felon, has taken an active and leading role in organizing and directing the conspiracies to violate Cordial's civil and federal rights and to commit tortious acts against Cordial.

277.

Cordial and Edwards have been damaged by Parks, Jr.'s fraud in an amount to be proven at trial.

**COUNT NINETEEN**

**CONVERSION AS TO DEFENDANT HOLDINGS**

278.

The allegations of paragraphs 1 through 118 of this complaint are hereby incorporated by reference and realleged as if each such allegation were fully set forth in this Count.

279.

Cordial paid $450,000 for its 36% membership interest in XpresSpa Atlanta -$250,000 in December 2011 and $200,000 in April 2014.  These payments were capital contributions to XpresSpa Atlanta, pursuant to the XpresSpa Atlanta Operating Agreement.

280.

The XpresSpa Atlanta Operating Agreement set forth a formula for the calculation of the members' capital account over the duration of the XpresSpa Atlanta joint venture.

281.

In general terms, each member's capital account was to be calculated by adding its capital contributions and allocations of annual net cash flow and subtracting distributions of net cash flow and capital withdrawals.

282.

Based upon the application of this formula, Cordial's capital account balance in XpresSpa Atlanta, as of the beginning of 2014, was approximately $450,000.

283.

Cordial's 2014 K-1, issued by Holdings in April 2015, understated Cordial's capital balance to be $316,453 as of the beginning of 2014.

284.

Holdings, in violation of the provisions of the XpresSpa Atlanta Operating Agreement and in complete disregard of generally accepted accounting principles, zeroed out Cordial's capital account balance in Cordial's 2014 K-1.

285.

There was no withdrawal by or return of capital to Cordial in 2014 and given that Holdings refused to remit Cordial's share of partnership income from XpresSpa Atlanta for the year 2014, Cordial's capital balance as of December 31, 2014 was in excess of $600,000. Cordial's capital account balance has increased as of December 31, 2015, December 31, 2016 and December 31, 2017 for each year of its undistributed net cash flow, such that Cordial's present capital account balance in XpresSpa Atlanta is likely in excess of $1,000,000.

286.

Holdings actions in zeroing out Cordial's capital account was an exercise of dominion and control, without legal justification, over property owned by Cordial.

287.

Cordial's 2014 K-1 for the year ending 2014 reported net cash flow to Cordial in excess of $150,000. Cordial was entitled to the distribution of these funds along with the K-1.

288.

Holdings exercised dominion and control, without legal justification, over Cordial's 2014 net cash flow.

289.

Holdings has also exercised dominion and control, without legal justification, over Cordial's 2015, 2016, and 2017 net cash flow.

290.

Further, under the XpresSpa Atlanta Operating Agreement, Cordial was entitled to 3.6% of gross revenues as its management fee.  Beginning in October 2014 and continuing to the present time, Holdings has exercised dominion and control over Cordial's management fees.

291.

Cordial has made repeated demands to Holdings for the restoration of its capital account in XpresSpa Atlanta and for the payment of Cordial's undistributed net cash flow and management fees. Holdings has refused to restore Cordial's capital account or to pay Cordial its accumulated net cash flow for 2014, 2015, 2016 and 2017, and has refused to pay Cordial its management fees from October 2014 to the present time.  It is these funds that the FAA referred to in its directive to the City to ensure that Cordial's contract rights are enforced, such that Holdings pays to Cordial all amounts due under the XpresSpa Atlanta Operating Agreement.

292.

Holdings is liable to Cordial for the conversion of Cordial's moneys, as set forth above, in an amount to be proven at trial.

## COUNT TWENTY

## RETALIATION CLAIMS AS TO THE DEFENDANTS CITY, REED AND HOLDINGS

293.

The allegations of paragraphs 1 through 118 of this complaint are hereby incorporated by reference and realleged as if each such allegation were fully set forth in this Count.

294.

Cordial, acting within its rights under the ACDBE Regulations, sought the advice, guidance and assistance of the Airport management in addressing XpresSpa Atlanta joint venture issues.

295.

Shortly after learning of Cordial's meeting with Airport management, Holdings launched a campaign of malicious, continuous, unrelenting retaliation against Cordial.

296.

Such retaliation has included, but not been limited to, (i) diverting and converting Cordial's net cash flow distributions and management fees; (ii) bribing and procuring breaches of fiduciary duties from Cordial's minority interest holders; (iii) manufacturing a false and unwarranted issue regarding Cordial's ACDBE certification, as a pretext to asserting an illegal termination of Cordial's membership interest in XpresSpa Atlanta; (iv) lobbying GDOT and USDOT to take adverse action against Cordial's ACDBE certification; (v) disseminating blatantly false information to the City and other parties regarding Cordial; and (vi) filing a meritless, frivolous lawsuit against Cordial and its members. Holdings' retaliation against Cordial is ongoing and continuing to the present time.

297.

Holdings' retaliation against Cordial was and is unlawful under *49 C.F.R. § 26.109(d).*

298.

Because of the City's inaction to address Holdings' wrongful and illegal actions, Cordial, acting within its rights under the ACDBE Regulations, filed a complaint with the FAA against the City alleging that the City was noncompliant with the ACDBE Regulations.

299.

After several months of investigation, the FAA came back with a report that agreed with Cordial's assertions that the City was noncompliant with the ACDBE Regulations in multiple ways including, but not limited to, the City's failure to prevent violations of the ACDBE Regulations by Holdings and the City's failure to properly monitor the XpresSpa Atlanta joint venture.  The FAA also directed the City to enforce Cordial's contract and ensure that Cordial was paid all moneys due to it under the XpresSpa Atlanta Operating Agreement.  The City has steadfastly refused to do so to this date.

300.

Rather than making good faith efforts to come into compliance with the ACDBE Regulations, the City, at the direction of Reed, adopted instead an attitude of bias, antagonism, and hostility towards Cordial and began retaliating against Cordial for having filed its complaint with the FAA against the City.

301.

The City's retaliation included, but is not limited to, (i) holding and conducting two administrative hearings and refusing to recuse itself, when the City knew that it was not a neutral, impartial arbiter; (ii) colluding with Holdings, Azure, MMC, Hutchinson, MD-Jones, and Parks, Jr, to violate Cordial's civil and

federal rights; (iii) cancelling Edwards' airport access badge to block her ability on behalf of Cordial to perform the ACDBE roles and responsibilities; (iv) threatening Edwards with being arrested and charged with harassment if she contacted Reed or any other official at the City or Airport about the noncompliance of Holdings and the failure of the OCC to seek Holdings' compliance with the ACDBE Regulations; and (v) spending more than $1 million in legal fees with Reed's close personal friend Whitner, so as to refuse having the City come into compliance with the ACDBE Regulations and the FAA's directives to the City. The City's retaliation is ongoing and continuing to the present time.

### 302.

The City's retaliation against Cordial was unlawful under *49 C.F.R. § 26.109(d).*

### 303.

Holdings and the City are liable to Cordial for their respective acts of retaliation against Cordial in an amount to be proven at trial.

## COUNT TWENTY-ONE

## ACTION FOR AN ACCOUNTING AS TO DEFENDANTS HOLDINGS, AZURE, MMC, HUTCHINSON, MD-JONES, AND PARKS, JR.

304.

The allegations of paragraphs 1 through 118 of this complaint are hereby incorporated by reference and realleged as if each such allegation were fully set forth in this Count.

305.

As a result of the conspiracies described in Counts Four and Sixteen above, and the other tortious acts described in this complaint, Cordial has been deprived of moneys due it in the form of net cash flow distributions and management fees from XpresSpa Atlanta since 2014.   These moneys have been improperly converted and diverted to other parties and entities, including Holdings, Azure, MMC, Hutchinson, MD-Jones, and Parks, Jr.

306.

Further, Holdings has engaged in improper financial transactions as to Cordial's capital account, net cash flow distributions and management fees.

307.

Further, Holdings has charged expenses to XpresSpa Atlanta to underwrite its retaliatory and tortious conduct against Cordial.

308.

As the holder of an economic membership interest in XpresSpa Atlanta only, and no rights of governance, Holdings has not possessed the legal authority to conduct financial transactions on behalf of XpresSpa Atlanta.

309.

Cordial is entitled to an accounting of the accounts of XpresSpa Atlanta from January 2012 until the present time, and of the accounts of Azure, MMC, Hutchinson, MD-Jones, and Parks, Jr. to the extent that moneys due and owing to Cordial have been improperly diverted to these entities and individuals.

## COUNT TWENTY-TWO

## UNJUST ENRICHMENT AND RESTITUTION AS TO DEFENDANTS HOLDINGS, AZURE, MMC, HUTCHINSON, MD-JONES, AND PARKS, JR.

310.

The allegations of paragraphs 1 through 118 of this complaint are hereby incorporated by reference and realleged as if each such allegation were fully set forth in this Count.

311.

Defendants Holdings, Azure, MMC, Hutchinson, MD-Jones, and Parks, Jr. have participated in conspiracies and tortious acts against Cordial, pursuant to which funds lawfully owing to Cordial have been converted, diverted, appropriated and paid to Holdings, Azure, MMC, Hutchinson, MD-Jones, and Parks, Jr.

312.

Defendants Holdings, Azure, MMC, Hutchinson, MD-Jones, and Parks, Jr. have received and are in possession of moneys lawfully due to Cordial.

313.

Defendants Holdings, Azure, MMC, Hutchinson, MD-Jones, and Parks, Jr. have been unjustly enriched at the expense of Cordial.

314.

Cordial is entitled to restitution from Defendants Holdings, Azure, MMC, Hutchinson, MD-Jones, and Parks, Jr. to the extent of each defendant's unjust enrichment, the respective amounts which shall be proven at trial.

## COUNT TWENTY-THREE

## INDEMNIFICATION AS TO DEFENDANT XPRESSPA ATLANTA

315.

The allegations of paragraphs 1 through 118 of this complaint are hereby incorporated by reference and realleged as if each such allegation were fully set forth in this Count.

316.

*Section 4.7(b)* of the XpresSpa Atlanta Operating Agreement provides:

The Company, its receiver or its trustee (but not the Members personally) shall indemnify and defend the Management Committee members, the Members and the employees of the Members (to the extent the Members and the employees were acting on behalf of the Company) (collectively, the "Indemnitees" and each an "Indemnitee") against, and hold them harmless from, any and all losses, judgments, costs, damages, liabilities, fines, claims and expenses (the "Claims") (including, but not limited to, reasonable attorneys' fees and court costs, which shall be paid by the Company as incurred) that may be made or imposed upon such persons and any amounts paid in settlement of any Claims sustained by the Company by reason of any act or inaction which is determined by the Management Committee in good faith to have been in the best interests of the Company

so long as such conduct shall not constitute willful misconduct or gross negligence.

317.

*Section 4.7(c)* of the XpresSpa Atlanta Operating Agreement provides:

The Company shall pay the expenses incurred by each of the Indemnitees in defending a civil or criminal action, suit or proceeding related to the business of the Company.  Any right of indemnity granted in this Agreement may be satisfied only out of the assets of the Company.  No Indemnitee shall be personally liable with respect to any such claim for indemnification.

318.

Holdings initiated baseless proceedings against Cordial, including administrative proceedings to terminate Cordial's membership and ownership interest in XpresSpa Atlanta and filing a frivolous New York state lawsuit against Cordial.   In defending itself against the meritless proceedings initiated by Holdings, Cordial has incurred significant expense, including substantial legal fees. In turn, Cordial has initiated meritorious proceedings, including its appeal of GDOT's November 2014 decision, the complaint with the FAA Office of Civil Rights, the Part 16 Complaint, and this litigation.

319.

All of these proceedings, including the baseless proceedings initiated by Holdings and the meritorious proceedings initiated by Cordial, have been related to the business of XpresSpa Atlanta.

320.

Cordial is entitled to indemnification from XpresSpa Atlanta to repay Cordial for its expenses incurred, including attorney's fees,  in the various proceedings which have taken place in this matter, including (i) Cordial's appeal to the USDOT of GDOT's November 2014 decision; (ii) Cordial's complaints to the FAA Office of Civil Rights; (iii) the two City administrative hearings; (iv) the FAA Part 16 proceedings; (v) the New York Supreme Court litigation; (vi) the appeal to the New York Appellate Division of Judge Ramos ruling; and (vii) this litigation, in an amount to be proven at trial.

## COUNT TWENTY-FOUR
### EXPENSES OF LITIGATION AS TO THE DEFENDANTS REED, HOLDINGS, AZURE, MMC, HUTCHINSON, MD-JONES, PARKS, AND PARKS, JR.

321.

The allegations of paragraphs 1 through 118 of this complaint are hereby incorporated by reference and realleged as if each such allegation were fully set forth in this Count.

322.

Defendants City, Reed, Holdings, Azure, MMC, Hutchinson, MD-Jones, Parks, and Parks, Jr. have caused Cordial and Edwards's unnecessary trouble and expense, have been stubbornly litigious, and have acted in bad faith.

323.

Accordingly, Cordial and Edwards are entitled to recover expenses of litigation, including reasonable attorney fees, from Defendants City, Reed, Holdings, Azure, MMC, Hutchinson, MD-Jones, Parks, and Parks, Jr., pursuant to *O.C.G.A. § 13-6-11*.

## COUNT TWENTY-FIVE

### PUNITIVE DAMAGES AS TO DEFENDANTS REED, HOLDINGS, AZURE, MMC, HUTCHINSON, MD-JONES, AND PARKS, JR.

324.

The allegations of paragraphs 1 through 118 of this complaint are hereby incorporated by reference and realleged as if each such allegation were fully set forth in this Count.

325.

Defendants Reed, Holdings, Azure, MMC, Hutchinson, MD-Jones, and Parks, Jr.'s actions in this matter show willful misconduct, malice, fraud, wantonness, oppression, and the entire want of care such that raises the presumption of conscious indifference to the consequences of their actions as to Cordial and Edwards.

326.

Defendants Reed, Holdings, Azure, MMC, Hutchinson, MD-Jones, and Parks, Jr. acted with the specific intent to cause harm to Cordial and Edwards.

327.

Defendants Reed, Holdings, Azure, MMC, Hutchinson, MD-Jones, and Parks, Jr. are liable to Cordial and Edwards for punitive damages under *O.C.G.A. § 51-12-5.1* to punish and penalize them for their misconduct, and to deter them from such misconduct in an amount to be determined in the enlightened conscience of the jury, not subject to statutory cap, and which amount Cordial and Edwards asserts should be in excess of $7,500,000 to deter such defendants from such conduct in the future.

## COUNT TWENTY-SIX

## MANDAMUS AS TO THE DEFENDANT CITY

### 328.

The allegations of Paragraphs 1 through 118 of this Application for Mandamus set forth above are hereby incorporated into this cause of action as if fully set forth and realleged.

### 329.

The City is a recipient of federal funds for the Airport.

### 330.

As a recipient of federal funds for the Airport, the City agreed to have an ACDBE program.

### 331.

As a recipient of federal funds for the Airport, the City agreed to serve in the role of Sponsor and comply with the ACDBE Regulations.

### 332.

The ACDBE Regulations provide, at *49 C.F.R. § 26.53(f)*, that a prime concessionaire cannot terminate an ACDBE firm unless it has received a prior written finding of good cause from the Airport recipient.

333.

It is undisputed that as of July 1, 2014 (the date of Holdings' purported first termination of Cordial' s membership/ownership interest in XpresSpa Atlanta) through October 5, 2014 (the date of Holding's purported final termination of Cordial's membership/ownership interest in XpresSpa Atlanta) and continuing through the date of April 9, 2016 (the date of the City's order purporting to provide a written finding of good cause for Cordial's termination), the City had not provided the prior written finding of good cause as required by *49 C.F.R. § 26.53(f)*.

334.

In its December 2015 investigative report, the FAA recognized that Holdings' purported July 1, 2014 and October 5, 2014 terminations of Cordial's membership/ownership interest in XpresSpa Atlanta were not in compliance with *49 C.F.R. § 26.53(f)* and flagged this noncompliance to the City.

335.

The FAA had regulatory oversight over the City's implementation of its CAP, adopted in response to the FAA's December 2015 investigative report.

336.

In its December 2015 investigative report, the FAA directed the City to enforce Cordial's contract rights.

337.

The FAA has express regulatory authority to review its recipients' determinations of good cause under *49 C.F.R. § 26.53(f).*

338.

In October 2016 and November 2016, the FAA, pursuant to its regulatory authority, rejected the City's April 9, 2016 written finding of good cause for Cordial's termination, ordering the City to retract its order and to have the good cause hearing conducted before an independent third party.

339.

Thus, as a result of the FAA's rejection of the City's April 9, 2016 order, there is no written finding of good cause in place for the termination of Cordial's membership/ownership interest in XpresSpa Atlanta.

340.

In its December 2015, the FAA directed the City to enforce Cordial's contract rights in the XpresSpa Atlanta Operating Agreement.

341.

In October 2016 and November 2016, the FAA reiterated its directives to the City for the City to enforce Cordial's contract rights in the XpresSpa Atlanta Operating Agreement.

342.

The City has defied and refused to comply with the FAA's directives to the City to enforce Cordial's contract rights in the XpresSpa Atlanta Operating Agreement.

343.

The City has a nondiscretionary duty, under *49 C.F.R. § 26.53(f),* to enforce Cordial's contract rights in the XpresSpa Atlanta Operating Agreement.

344.

The City has a nondiscretionary duty, under the FAA's December 2015, October 2016 and November 2016 directives, to enforce Cordial's contract rights in the XpresSpa Atlanta Operating Agreement.

345.

The vehicle by which the City is able to enforce Cordial's contract rights in the XpresSpa Atlanta Operating Agreement is to issue notices of default pursuant to the A Store Lease and D, E, and F Store Lease, directing XpresSpa Atlanta to pay all monies due under the agreements to Cordial, or be subjected to the City's contract default remedies.

346.

Cordial is entitled to the issuance of a writ of mandamus from this Court ordering the City to enforce all of Cordial's contract rights in the XpresSpa Atlanta Operating Agreement.

## PLAINTIFFS' PRAYER FOR RELIEF

Wherefore, Cordial and Edwards respectfully demand and pray for judgment against Defendants as follows:

(a) That process issue and be served as provided by law;

(b) That judgment be entered in favor of Cordial and against Defendants City and Reed on Count One (Section 1983 Fourteenth Amendment Procedural Due Process Claim) of the complaint;

(c) That judgment be entered in favor of Cordial and against Defendants City and Reed jointly and severally on Count Two (Section 1983 Fifth and Fourteenth Amendment Substantive Due Process Claim) of the complaint for damages caused which are in excess of $5,000,000;

(d) That judgment be entered in favor of Cordial and against Defendants City and Reed jointly and severally on Count Three (Section 1983 Fourteenth Amendment Equal Protection Claim) of the complaint;

(e) That judgment be entered in favor of Cordial and Edwards and against Defendants City, Reed, Holdings, Azure, MMC, Hutchinson, MD-Jones, and Parks, Jr. jointly and severally on Count Four (Section 1985 Conspiracy to Violate Cordial's Civil and Federal Rights) of the complaint for damages caused to Cordial and Edwards which are in excess of $7,500,000;

(f) That judgment be entered in favor of Cordial and against Defendants City and Reed on Count Five (Section 1986 Claim for allowing Cordial's Civil and Federal Rights to be Violated) of the complaint;

(g) That judgment be entered in favor of Cordial and against Defendants City, Reed, Holdings, Azure, MMC, Hutchinson, MD-Jones, and Parks,

Jr. jointly and severally on Count Six (Section 1988 Claim for Attorney's Fees) of the complaint for fees incurred in excess of $500,000;

(h) That judgment be entered in favor of Cordial and Edwards and against Defendants Reed, Holdings, Azure, MMC, Hutchinson, MD-Jones, and Parks, Jr. jointly and severally on Count Seven (Federal Punitive Damages) of the complaint, which amount is to be determined by the enlightened conscience of the jury and which amount Cordial and Edwards asserts should be in excess of $7,500,000 to deter such defendants from such conduct in the future);

(i) That judgment be entered in favor of Cordial against Defendant Holdings on Count Eight (Declaratory Judgment Regarding Holdings' Status in XpresSpa Atlanta) of the complaint;

(j) That judgment be entered in favor of Cordial and against Defendants Holdings and XpresSpa Atlanta on Count Nine (Declaratory Judgment that Cordial Remains a Member of XpresSpa Atlanta) of the complaint;

(k) That judgment be entered in favor of Cordial and against Defendants Holdings on Count Ten (Declaratory Judgment that Holdings had no Right of Set Off against Cordial's Profit Distribution and Management Fees) of the complaint;

(l) That judgment be entered in favor of Cordial and Edwards and against Defendants Reed, Holdings, Azure, MMC, Hutchinson, MD-Jones, and Parks, Jr. jointly and severally on Count Eleven (Tortious Interference with Cordial's Operating Agreement) of the complaint for damages incurred by Cordial and Edwards which are in excess of $7,500,000;

(m)   That judgment be entered in favor of Cordial and against Defendants Reed, Azure, MMC, Hutchinson, MD-Jones, and Parks, Jr. jointly and severally on Count Twelve (Tortious Interference with XpresSpa Atlanta Operating Agreement) of the complaint for damages incurred by Cordial which are in excess of $7,500,000;

(n) That judgment be entered in favor of Cordial and Edwards and against Defendants Reed, Holdings, Azure, MMC, Hutchinson, MD-Jones, and Parks, Jr. jointly and severally on Count Thirteen (Tortious Interference with Cordial and Edwards' Business Relations) of the complaint for damages incurred by Cordial which are in excess of $7,500,000;

(o) That judgment be entered in favor of Cordial and against Defendants Holdings on Count Fourteen (Breach of Fiduciary Duties as to XpresSpa Atlanta) of the complaint for damages incurred by Cordial which are in excess of $7,500,000;

(p) That judgment be entered in favor of Cordial and Edwards and against Defendant Parks, Jr. on Count Fifteen (Breach of Fiduciary Duties as to Cordial and Edwards) of the complaint for damages incurred by Cordial which are in excess of $7,500,000;

(q) That judgment be entered in favor of Cordial and Edwards and against Defendants Reed, Holdings, Azure, MMC, Hutchinson, MD-Jones, and Parks, Jr. jointly and severally on Count Sixteen (State Law Civil Conspiracy) of the complaint for damages incurred by Cordial which are in excess of $7,500,000;

(r) That judgment be entered in favor of Cordial and Edwards and against Defendants K. Parks. on Count Seventeen (Breach of Contract) of the complaint for damages incurred by Cordial and Edwards in an amount to be proven at trial;

(s) That judgment be entered in favor of Cordial and Edwards and against Defendants Parks, Jr. on Count Eighteen (Fraud) of the complaint in an amount to be proven at trial;

(t) That judgment be entered in favor of Cordial and against Defendants Holdings on Count Nineteen (Conversion) of the complaint for damages incurred by Cordial which are in excess of $1,000,000;

(u) That judgment be entered in favor of Cordial and Edwards and against Defendants City, Reed, and Holdings jointly and severally on Count Twenty (Retaliation) of the complaint in an amount to be proven at trial;

(v) That judgment be entered in favor of Cordial and Edwards and against Defendants Holdings, Azure, MMC, Hutchinson, MD-Jones, and Parks, Jr. on Count Twenty-One (Action for an Accounting) of the complaint;

(w)   That judgment be entered in favor of Cordial and Edwards and against Defendants Holdings, Azure, MMC, Hutchinson, MD-Jones, and Parks, Jr. jointly and severally on Count Twenty-Two (Unjust Enrichment/Restitution) of the complaint for damages incurred by Cordial and Edwards in an amount in excess of $1,000,000;

(x) That judgment be entered in favor of Cordial and against Defendant XpresSpa Atlanta on Count Twenty-Three (Indemnification) of the complaint in excess of $500,000;

(y) That judgment be entered in favor of Cordial and Edwards and against Defendants Reed, Holdings, Azure, MMC, Hutchinson, MD-Jones, and Parks, Jr. jointly and severally on Count Twenty-Four (Expenses of Litigation) of the complaint in an amount in excess of $500,000;

(z) That judgment be entered in favor of Cordial and Edwards and against Defendants Reed, Holdings, Azure, MMC, Hutchinson, MD-Jones, and Parks, Jr. jointly and severally on Count Twenty-Five (State Law Punitive Damages) of the complaint, which amount is to be determined by the enlightened conscience of the jury and which amount Cordial and Edwards asserts should be in excess of $7,500,000 to deter such defendants from such conduct in the future);

(aa) That judgment be entered in favor of Cordial and against the City on Count Twenty-Six (Mandamus) of the complaint;

(bb) That Cordial and Edwards have a trial by jury;

(cc) That Cordial and Edwards have such other relief as may be justified by the facts and law.

This 3rd day of October, 2018.

/s/  Kevin A. Ross                                
Kevin A. Ross
Georgia Bar Number 675184
Attorney for Plaintiffs
Cordial Endeavor Concessions of Atlanta,
LLC and Shelia Edwards

The Law Practice of Kevin A. Ross, LLC
2255 Cumberland Parkway
Building 700, Suite B
Atlanta, Georgia 30339
(404) 841-7807 – Phone
(404) 844-4972 – E-Fax
kross@krosspa.com

/s/  Carl A. Gebo                                
Carl A. Gebo
Georgia Bar Number 288711
Attorney for Plaintiffs
Cordial Endeavor Concessions of Atlanta,
LLC and Shelia Edwards

The Gebo Law Group
200 Walker Street, SW
Suite E
Atlanta, Georgia 30313
(404) 219-4516 – Phone
Carl.gebo@gebolawgroup.com

/s/  Thelma Wyatt Moore
Thelma Wyatt Moore
Georgia Bar Number 779300
Attorney for Plaintiffs
Cordial Endeavor Concessions of Atlanta,
LLC and Shelia Edwards

Moore Law, LLC
3285 Main Street
Atlanta, Georgia 30337
(404) 699-6001 (Office)
(678) 472-1372 (Mobile)
(866) 257-5052 (Fax)
tmoore@moore-legal.com

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that the documents to which this certificate is attached have been prepared with one of the font and point selections approved by the Court in Local Rule 5.1C for documents prepared by computer.


/s/  Kevin A. Ross

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

**CORDIAL ENDEAVOR
CONCESSIONS
OF ATLANTA, LLC, ET AL,**

            **Plaintiffs,**

**vs.**

**CITY OF ATLANTA, ET AL,**

            **Defendants.**

**CIVIL ACTION FILE NO.
1:18-CV-01973-MHC**

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day electronically filed **PLAINTIFFS'**

**VERIFIED AMENDED COMPLAINT** with the Clerk of Court using the

CM/ECF system which will provide automatic notification of such filing to the

following counsel of record:

Carl Alexander Gebo, Esq.
Gebo Law Group, LLC
The Johnson & Johnson Building
200 Walker Street, SW, Suite E
Atlanta, Georgia 30313

Mark Gerald Trigg, Esq.
Dentons US LLP
303 Peachtree Street, NE, Suite 5300
Atlanta, Georgia 30308

Larry M. Dingle, Esq.  
Kyler Lee Wise  
Wilson Brock & Irby  
2849 Paces Ferry Road  
Overlook I, Suite 700  
Atlanta, Georgia 30339  

Eric David Stolze, Esq.  
William K. Whitner, Esq.  
Paul Hastings LLP-GA  
1170 Peachtree Street, NE, Suite 100  
Atlanta, Georgia 30309  

Thelma Wyatt Moore, Esq.  
Moore Law, LLC  
3285 Main Street  
Atlanta, Georgia 30337  

Michael V. Coleman, Esq.  
Thompson Hine LLP-GA  
Two Alliance Center, Suite 1600  
3560 Lenox Road  
Atlanta, Georgia 30326  

/s/  Kevin A. Ross  
Kevin A. Ross  
Georgia Bar No. 675184  
Attorney for Plaintiffs Cordial  
Endeavor Concessions of Atlanta, LLC  
and Shelia Edwards  

The Law Practice of Kevin A. Ross, LLC  
2255 Cumberland Parkway  
Building 700, Suite B  
Atlanta, Georgia 30339  
404-841-7807– Phone  
404-601-9732 - Fax  
kross@krosspa.com  

2